IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
HEARD AT MEMPHIS

## STATE OF TENNESSEE v. ROY E. KEOUGH

**An Appeal from the Criminal Court for Shelby County
No. 96-01977/76     L. T. Lafferty, Judge**

---

**No. W1997-00201-SC-DDT-DD - Decided April 10, 2000**

---

A jury convicted the defendant of premeditated first degree murder and attempted first degree murder. The jury imposed a death sentence after finding that evidence of an aggravating circumstance, that the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person, outweighed evidence of mitigating circumstances beyond a reasonable doubt. In a separate proceeding, the trial judge found the defendant to be a Range II, multiple offender and imposed a sentence of forty years for the attempted first degree murder conviction, to run consecutively to the death sentence for the premeditated first degree murder conviction. On direct appeal, the Court of Criminal Appeals affirmed the convictions and the sentences. The Tennessee Supreme Court held that the evidence was sufficient to support the premeditated first degree murder conviction, that the trial court did not err in refusing to allow the defendant to cross-examine the only detective called by the State with a statement the defendant made to other officers, and that the sentence of death is not excessive or disproportion to the penalty imposed in similar cases. Accordingly, the Tennessee Supreme Court affirmed the Court of Criminal Appeals in all respects.

**Tenn. R. App. P. 3 Direct Appeal from the Court of Criminal Appeals; Judgment of the Court of Criminal Appeals Affirmed.**

ANDERSON, C. J., delivered the opinion of the Court, in which DROWOTA, BIRCH, HOLDER, and BARKER, JJ., joined.

Joseph S. Ozment and James V. Ball, Memphis, Tennessee, for the appellant, Roy E. Keough

Michael E. Moore, Solicitor General, and Tonya Miner, Assistant Attorney General, Nashville, Tennessee (On Appeal), and John W. Pierotti, District Attorney General, and Robert Carter and Rosemary Andrews, Assistant District Attorneys General, Memphis, Tennessee (At Trial), for the appellee, State of Tennessee

### OPINION

CHIEF JUSTICE ANDERSON delivered the opinion of the Court.

The defendant, Roy E. Keough, was convicted of one count of premeditated first degree murder and one count of attempted first degree murder. The jury imposed a death sentence after finding that evidence of an aggravating circumstance, i.e., that the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person,[1] outweighed evidence of mitigating circumstances beyond a reasonable doubt. The trial judge found the defendant to be a Range II, multiple offender and imposed a sentence of forty years for the attempted first degree murder conviction, to run consecutively to the death sentence.

On direct appeal, the Court of Criminal Appeals affirmed the convictions and the sentences imposed. After the case was docketed in this Court,[2] we reviewed the Court of Criminal Appeals' decision, the record, and the applicable authority, and entered an order specifying three issues for argument:[3] First, whether the evidence was sufficient to support the conviction for premeditated first degree murder; second, whether the trial court erred in refusing to allow the defendant to cross-examine Detective Nichols with a statement the defendant made to other officers; and last, whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases.

We have concluded that the evidence was sufficient to support the verdict for premeditated first degree murder and that the trial court did not abuse its discretion in refusing to allow the defendant to cross-examine Detective Nichols with a statement the defendant made to other officers. We further conclude that the evidence supports the jury's findings as to aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases considering the nature of the crime and the defendant. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

## Background

### *Guilt Phase*

---

[1]   Tenn. Code Ann. § 39-13-204(i)(2) (1997 & Supp. 1999).

[2]   Oral argument was heard in this case on November 17, 1999, in Memphis, Shelby County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[3]   "The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court." Tenn. Code Ann. § 39-13-206(a)(1) (1997). "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument. . . ." Tenn. R. Sup. Ct. 12.2.

The defendant, Roy Keough, and his estranged wife, Betty Keough, were separated following a stormy marriage of two years that was beset with problems and arguments. After the separation, the defendant and his girlfriend rented a room at the home of his girlfriend's brother, Bobby Holly. In December of 1995, the defendant moved out of the residence, and Kevin Berry, a friend of Holly's, moved in.

On December 24, 1995, the victim, Betty Keough, visited the Holly residence several times looking for the defendant. At around 11:30 a.m., the victim told Holly that she had a gun in her car; she threatened to kill the defendant and his girlfriend if she found them. She returned around 3:00 p.m.; she appeared to have been drinking, but she did not make any threats during this visit. Sometime after the victim left, the defendant stopped by the Holly residence. Kevin Berry told the defendant that the victim was looking for him. The defendant left.

The victim returned to the Holly residence for the third time around 8:30 p.m. She asked Kevin Berry to join her for a drink at a neighborhood bar. Although the two had not met before that day, Berry accepted the offer. The two drove to Irene's Grill in the victim's car. Shortly after they departed, the defendant stopped by the Holly residence to see if the victim had returned. Holly told the defendant that the victim and Berry had gone to Irene's Grill. The defendant seemed calm and did not appear to have been drinking. Holly testified that the defendant appeared to have parked his car where it could not be seen.

The victim and Berry were seated at a table drinking beer when the defendant arrived at Irene's Grill. According to witnesses, the defendant and the victim began "talking loud" and appeared to have an argument. Berry testified that the defendant got "louder and louder" and wanted to know what the victim was doing there. The owner of the bar did not hear the victim and the defendant arguing, but she nonetheless asked them to leave the bar. She testified that the defendant did not appear to be drunk, but she refused to serve him a beer. The defendant, the victim, and Berry walked through a hallway toward the back door. According to one witness, the victim appeared to push either the defendant or Berry.

Berry testified that the defendant and the victim continued to argue as the three walked to the victim's car in the parking lot. The defendant asked Berry to drive his car back to the Holly residence; Berry, who had been drinking a beer, declined. Berry testified that the defendant then "pushed [the victim] with both hands" with "some force behind it." When Berry stepped forward to intervene, the defendant stabbed him in the chest with a knife. Berry tried to run but was pursued by the defendant and stabbed in the thigh. Berry pushed the defendant away and ran toward the bar; the defendant again caught him and stabbed him in the back. Berry somehow managed to escape into the bar where individuals tended to his wounds and called police.

Officer James Currin arrived at the scene at approximately 10:00 p.m. After checking on Berry's condition and talking to individuals in the bar, he went outside to the parking lot and found the victim in her car slumped over the steering wheel. She was not moving. There was blood on her face and on the seat of the car. The car doors were locked. Currin broke out the rear window of the car so paramedics could examine the victim and confirm that she was dead.

Martha Stephenson, the defendant's girlfriend, testified that she had lived with the defendant off and on for about twenty years. The defendant called her at her daughter's home around 9:30 p.m. and asked for money for gasoline. She borrowed ten dollars from her daughter and went to the Holly residence but was unable to find the defendant. She returned to her daughter's home, where she found the defendant in the driveway. The defendant told her that "he had just stabbed his wife and her boyfriend" and that he had thrown the knife away. When she told the defendant that she did not have any money, he said he would just wait on the police.

Stephenson's daughter, Mary Stokes, testified that the defendant showed up at her home and asked to borrow money. She told the defendant she did not have any money. The defendant said that he and the victim had a fight. The defendant asked for a drink and went outside to "wait for the police." He drank half a fifth of vodka and also some rum. The defendant asked to use the phone to call his attorney. Stokes testified that she heard the defendant say that he had "stabbed his wife" and that "she was probably dead." An officer later arrived and arrested the defendant. The arresting officer testified that the defendant asked him, "which one did I get ?"[4]

The defendant gave a statement to Detective James Nichols the next day. Nichols testified that he read the defendant his <u>Miranda</u> rights and that attorney Leslie Ballin was present for the interview. According to Nichols, the defendant said he had been looking for his wife when he found her in the bar with another man. They became involved in a verbal dispute and were asked to leave by the management of the bar. Nichols testified that the defendant told him that the argument with the victim escalated once they went outside and that he stabbed the victim with a rifle knife. The defendant also told Nichols that he also stabbed the man who was with his wife at the time. The defendant further said, however, that "[h]e was angry or . . . his emotions were so high he couldn't remember how many times or where he had stabbed his wife or where he had stabbed the man that was with his wife."

A forensic pathologist testified that the victim, age forty-two, sustained a large stab wound at the top of her breastbone, which penetrated almost six inches into her chest cavity. The wound inflicted upon her probably did not immediately render her unconscious; death probably occurred within two to five minutes. The wound was consistent with that caused by a bayonet used with a moderate amount of force. There were no other wounds on the victim of a defensive nature.

Several witnesses, including three who were present at Irene's Grill, testified during the defendant's proof. Joanne Waine testified that she did not see any argument or pushing between the defendant and the victim. Lisse Moore testified that she believed the victim may have pushed the defendant as they walked out of the bar. Virginia Walden testified that she saw the victim slap the

---

[4] Defense counsel objected and moved for a mistrial on the basis that the prosecution did not disclose this statement as required under Tenn. R. Crim. P. 16(a)(1)(A). The prosecution's only explanation was that it did not know what discovery had been obtained by the defense and that it had learned of the statement only prior to calling the arresting officer to testify. The trial court overruled the motion for a mistrial. The defendant did not raise the issue on appeal.

defendant while still inside the bar. Bobby Holly testified that the victim had been looking for the defendant on the day in question. She told Holly that she would kill the defendant and his girlfriend if she found them. Holly contacted the defendant and told him about the threat.

After deliberating on the charges, the jury convicted the defendant of premeditated first degree murder and attempted first degree murder.

### *Sentencing Phase*

Joyce Smart, the victim's sister, testified that the victim's first husband died after he and the victim had been married for twenty-three years. The victim met the defendant several months later, and they eventually married. The victim was a grandmother and a very friendly woman. Ms. Smart concluded that "our Christmases will never be the same."

The prosecution introduced court records indicating that the defendant was convicted of assault to commit voluntary manslaughter in Tennessee in 1974 and of manslaughter in Mississippi in 1989.

Several witnesses testified on behalf of the defendant. The defendant, fifty-three years old, was one of eight children. Two of the defendant's sisters asked the jury to spare his life. Although the defendant was generally cordial and nice, he and the victim had a "stormy" relationship. William Powers testified that he worked with the defendant at a body shop for six or seven years. On one occasion, the victim showed up at work, argued with the defendant, and tried to hit the defendant with an air ratchet.

The jury found that the prosecution had proven one aggravating circumstance– that the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person. Tenn. Code Ann. § 39-13-204(i)(2) (1997 & Supp. 1999). The jury also found that the evidence of this aggravating circumstance outweighed evidence of any mitigating circumstances beyond a reasonable doubt and therefore imposed a sentence of death. In a separate sentencing proceeding, the trial court imposed a forty year sentence as a Range II offender for the attempted first degree murder, to run consecutively. The Court of Criminal Appeals thereafter affirmed the convictions and the sentences.

### **Sufficiency of Evidence**

The defendant argues that there was insufficient evidence of premeditation to establish the first degree murder of Betty Keough. The State maintains that the evidence was sufficient to support the jury's verdict.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions regarding the credibility of witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. Id.; State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994).

First degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997 & Supp. 1999). By statute, the element of premeditation is defined as follows:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997 & Supp. 1999). In Bland, we identified several circumstances which may warrant the trier of fact to find or infer premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; any threats or declarations of intent to kill made by the defendant; the procurement of a weapon; any preparations to conceal the crime which are undertaken before the crime is committed; and calmness immediately following a killing. Bland, 958 S.W.2d at 660.

In our view, the evidence of premeditation, although far from overwhelming, was legally sufficient to support the jury's verdict. When viewed in a light most favorable to the prosecution, the evidence revealed: that the defendant was looking for the victim on the night in question; that the defendant was in possession of a rifle knife or bayonet; that the defendant found the victim at a bar drinking with another man; that an argument ensued between the defendant and the victim; that once outside the bar, the defendant stabbed the unarmed victim forcibly in the chest with the bayonet; that the defendant disposed of the murder weapon; and, that the defendant sought money to flee. This evidence, when viewed as a whole under the appropriate standards of appellate review, was legally sufficient to support a finding that the defendant acted with premeditation.

### Cross-Examination of Detective Nichols

The defendant contends that the trial court erred in refusing to allow the defendant to cross-examine Detective Nichols with a statement the defendant later made to other officers. The underlying circumstances are as follows:

On the day after the killing, the defendant, having waived his Miranda rights, gave an oral statement to Detective James Nichols. The defendant admitted that he had been looking for the victim when he found her in a bar in the company of another man, and that, following an argument,

-6-

he stabbed both the victim and the man. The record indicates that Nichols took notes of the interview, but the statement was not transcribed or recorded. When Nichols was then called away on another case, the defendant, after receiving his Miranda rights a second time, gave a statement to Detectives Sullivan and Stewart. This statement was placed in writing; it was similar to what the defendant had told Nichols, but contained the defendant's assertion that the victim carried a gun and had shot at him on an earlier occasion.

At trial, Nichols testified as to the defendant's oral statement. Nichols' notes from the interview were not introduced. The defense then sought to cross-examine Nichols by introducing the portion of the defendant's written statement in which he told Sullivan and Stewart that the victim carried a gun and had once shot at him. The trial court refused to allow the cross-examination on the basis that Nichols did not have personal knowledge of what the defendant may have told the other officers. The State maintains that this ruling was proper.

In support of his position, the defendant relies primarily on the following language found in Espitia v. State, 288 S.W.2d 731, 733 (Tenn. 1956), and later cases:

> When a confession is admissible, the whole of what the accused said upon the subject at the time of making the confession is admissible and should be taken together; and if the prosecution fails to prove the whole statement, the accused is entitled to put in evidence all that was said to and by him at the time which bears upon the subject of controversy including any exculpatory or self-serving declarations connected therewith.

Id. (quoting 20 Am. Jur. Evidence § 488 (1939)). At least one treatise contains similar language, 23 C.J.S. Criminal Law § 885 (1989 & Supp. 1999).

In a later case, Sambolin v. State, 387 S.W.2d 817, 819 (Tenn. 1965), citing language similar to that found in Espitia, the Supreme Court held that the trial court erred in allowing an officer to testify as to the defendant's statement when the State had failed to furnish a copy of the summary found in the police report to the defendant. Likewise, in State v. Robinson, 622 S.W.2d 62, 69-70 (Tenn. Crim. App. 1980), the Court of Criminal Appeals indicated that the defendant should have been permitted to introduce his statement, including an exculpatory portion, following the State's introduction of a version that had been redacted to comply with the Bruton rule.[5]

These Tennessee decisions relied on by the defendant are, however, factually distinguishable from the present case and, in any event, predate the enactment of the Tennessee Rules of Evidence. We therefore turn to the analogous provision found in Tenn. R. Evid. 106, which states:

---

[5] In Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the Court held that admission of a codefendant's confession implicating the defendant in a joint trial violates the defendant's constitutional right of confrontation.

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Id. As one commentator has said, this so-called "rule of completeness" allows the trier of fact to "assess related information at the same time rather than piecemeal." Neil P. Cohen et al., Tennessee Law of Evidence § 106.1, at 33 (3d ed. 1995).

In our view, Rule 106 reflects the concern for fairness found in cases such as Espitia – that the trier of fact be permitted to assess related information without being misled by hearing only certain portions of evidence. Cohen, § 106.1, at 33. Accordingly, it appears that where the prosecution introduces a statement made by the defendant, the trial court may in the interest of fairness order that the remainder of the statement be admitted as well under Rule 106. Indeed, it would not be consistent with fundamental fairness to allow the prosecution to introduce only the most incriminating portions of a defendant's statement without regard to the overall context or relevant exculpatory portions found in the same statement. As Espitia indicates, the jury is to determine which statements to accredit.

In any event, we conclude that Rule 106 is not applicable and that the defendant is not entitled to relief in this case. In short, we cannot conclude that the trial court abused its discretion in finding that the defendant, in essence, gave two statements: an oral statement to Detective Nichols followed by a written statement to Detectives Sullivan and Stewart. The statements were given to different officers, and the defendant was read his Miranda rights before giving each statement.

Moreover, it appears that Detective Nichols did not have personal knowledge of what the defendant later told Sullivan and Stewart. The State did not call Sullivan or Stewart as witnesses, nor did it attempt to introduce the written statement.[6] Likewise, the defendant did not call these witnesses. Finally, we observe that the defendant is not entitled to relief on this issue because there was other evidence in the record that the victim had threatened to kill the defendant on the day in question. Under these circumstances, our narrow holding is that the trial court did not abuse its discretion in refusing to allow the defendant to cross-examine Nichols with a statement made by the defendant to two other officers.

## **Proportionality**

Where a defendant has been sentenced to death, we must undertake a comparative proportionality review pursuant to Tenn. Code Ann. § 39-13-206(c)(1) (1997). The analysis is designed to identify aberrant, arbitrary or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct.

---

[6] The statement was apparently introduced for identification purposes only.

871, 875, 79 L. Ed. 2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. Id. at 668; see also State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998).

This Court has consistently employed the precedent-seeking method of comparative proportionality review, which compares a case with cases involving similar defendants and similar crimes. Bland, 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on nondecedent victims. We also consider multiple factors about the defendant: (1) prior criminal record; (2) age, race and gender; (3) mental, emotional and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id. at 667. Since no two defendants and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. Id. at 668.

In this case, evidence in the record shows that the defendant and the victim were separated following a troubled marital relationship. The day of the offense, the defendant learned the victim was looking for him and had threatened to kill him, so he in turn decided to try to find her. He was told that she was at Irene's Grill with another man. He went to the Grill and found her having a drink with another man. An argument ensued which eventually escalated into the parking lot. The defendant stabbed the victim with a bayonet with sufficient force to produce a wound nearly six inches deep into the chest cavity. Although there was evidence of an argument, there is no proof whatsoever that the victim was armed or that the defendant was in anyway provoked into the killing or in anyway justified. Moreover, the defendant also pursued and repeatedly stabbed the other man who was at the scene – indeed, Kevin Berry was not killed only because he was able to escape from the defendant, despite three separate stab wounds, and summon help.

The defendant, a white male, was fifty-three years of age at the time of sentencing. He had twice been convicted for felonies involving violence – in 1974 he was convicted of assault with intent to commit voluntary manslaughter, and in 1989 he pled guilty to the offense of manslaughter. These convictions certainly established the single aggravating circumstance in this case. There was no evidence regarding the defendant's mental, physical or psychological condition. The record does reveal that the defendant's marriage to the victim had been a troubled one. The defendant ultimately waited for police to arrive to make the arrest, but not before disposing of the murder weapon and trying to obtain money for gasoline to flee. Although the defendant told several individuals that he had stabbed the victim and another individual, there is no proof that he exhibited any remorse for his actions. Finally, there was little evidence regarding the defendant's potential for rehabilitation.

We have reviewed and upheld the death sentence in numerous cases bearing similarity to the present case. For example, in the following cases, the sentence of death was imposed and upheld where the defendant had killed an estranged wife or girlfriend in a domestic violence context. State v. Hall, 958 S.W.2d 679 (Tenn. 1997); State v. Johnson, 743 S.W.2d 154 (Tenn. 1987); State v.

Cooper, 718 S.W.2d 256 (Tenn. 1986). Similarly, we have often upheld the sentence where the sole aggravating circumstance was the defendant's prior convictions for felonies involving violence or whose statutory elements involve violence. State v. Smith, 993 S.W.2d 6 (Tenn. 1999); State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987); State v. Goad, 707 S.W.2d 846 (Tenn. 1986). We have also upheld the death sentence in cases where the means and manner of death involved a stabbing. See, e.g., State v. Mann, 959 S.W.2d 503 (Tenn. 1997); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989). Finally, we have upheld death sentences imposed on defendants who were of similar age to the defendant. State v. Wilcoxson, 772 S.W.2d 33 (Tenn. 1989); State v. Barnes, 703 S.W.2d 611 (Tenn. 1985).

The defendant argues that the evidence of premeditation was insufficient and that the defendant committed the killing in a state of passion provoked by the victim.[7] Our review indicates that some defendants have received lesser sentences for similar crimes against estranged wives or girlfriends. See, e.g., State v. Dick, 872 S.W.2d 938 (Tenn. Crim. App. 1993). We also observe that this case involves a single stab wound in contrast to those death penalty cases involving multiple stab wounds. See State v. Pike, 978 S.W.2d 904 (Tenn. 1998); State v. Bush, 942 S.W.2d 489 (Tenn. 1997).

Our function, however, is not to invalidate a death sentence merely because the circumstances may be similar to those in which a defendant received a less severe sentence. Burns, 979 S.W.2d at 285. Instead, our review requires a determination of whether a case plainly lacks circumstances found in similar cases where the death penalty has been imposed. Id. Here, the similarity of the circumstances to cases in which the death penalty has been upheld and, in particular, the strength of the aggravating circumstance – the defendant's two prior convictions for violent felonies – reveals that the penalty is not arbitrary or disproportionate as applied in this case.

### Conclusion

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding of the statutory aggravating circumstance, that the evidence supports the jury's finding that the aggravating circumstance outweighs evidence of mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge David Welles and joined in by Judge Joe Riley. The relevant portions of that opinion are attached as an appendix to this opinion. The defendant's

---

[7] The defendant also makes a general challenge to the Bland analysis, notwithstanding the fact that we have consistently employed this analysis in our review. See, e.g., Burns, 979 S.W.2d at 283-84.

-10-

sentence of death is affirmed and shall be carried out on the <u>10th</u> day of July, 2000, unless otherwise ordered by this Court or proper authority.

It appearing that the defendant Roy Keough is indigent, costs of appeal are taxed to the State.