# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 18, 2001

# STATE OF TENNESSEE v. JACOB LEE DAVIS

**Direct Appeal from the Circuit Court for Lincoln County**
**No. S-9800087     Charles Lee, Judge**

---

### No. M1999-02496-CCA-R3-CD - Filed May 8, 2001

---

Following a jury trial, Defendant, Jacob Lee Davis, was convicted of premeditated first degree murder, reckless endangerment, and carrying a weapon on school property. The trial court sentenced him to life imprisonment for the first degree murder conviction and one year each for the reckless endangerment and carrying a weapon on school property convictions. The trial court ordered that the latter sentences be served concurrent to the sentence for life imprisonment. On appeal, the Defendant challenges the sufficiency of the evidence to sustain each of the convictions and argues that the trial court erred in failing to strike six potential jurors for cause. After a review of the record, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgment of the Lincoln County Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

John B. Nisbet, III, Cookeville, Tennessee (on appeal); Donna Hargrove, District Public Defender; A. Jackson Dearing, III, Assistant Public Defender; Raymond W. Fraley, Jr., Fayetteville, Tennessee, and Rich McGee, Nashville, Tennessee (at trial), for the appellant, Jacob Lee Davis.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; W. Michael McCown, District Attorney General; Weakley E. Barnard, Assistant District Attorney General; and Ann L. Filer, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## I. FACTS

In 1997, at the start of their senior year at Lincoln County High School, in Fayetteville, Tennessee, Nick Creson (the victim) and Tonya Bishop had been involved in a two-year relationship. Creson and Bishop lived in the same neighborhood, attended the same church, and had attended school together since sixth grade. In the fall of 1997, Creson and Bishop broke up and Bishop began to date the Defendant. Bishop testified that although she and Creson were no longer dating, they continued to share a locker, had classes together and often engaged in sexual relations, until some time following the Christmas of 1997. Bishop further testified that the Defendant was jealous of Bishop's continued association with Creson.

In March of 1998, Defendant discovered that Bishop and Creson were having sexual relations and he confronted Bishop about it. Bishop testified that she and the Defendant had a three to four hour discussion in her car in the school parking lot, during which the Defendant was crying and shaking uncontrollably. The next day, Defendant delivered the following letter to Bishop:

> Tonya: In case you missed it at break, I want to scream. When someone has a problem they usually go to friends and lay their head on a shoulder. I don't have a shoulder. You told me last night to shut my mouth. Well here it is.
>
> You know I will not leave you and you take advantage of me. I scream in protest, and you talk about work. I scream because I have the fate to fall for one who could not be mine, and you talk about the weather. I don't deserve this, Tonya. From the beginning I have given you nothing but my all. For what? To be with you. That is all I have asked. I am faithful, I am true, I am honest. My heart screams, "how could you?" You talk about you are not at work.
>
> I bleed, and for that he should bleed as well. Justice says he deserves it. I want to hear his skin sear and pop under fire while I stand in front of him and recite the lyrics to Soma by the Smashing Pumpkins. I want to put a three inch diameter hole in his chest from a 12 gauge. I want to dip my finger in his blood and write the words to the song Mayonnaise on his truck. My friends say I should take his anger out on you. You know as well as I do I can't do that. It must go somewhere. Thus this letter.
>
> Don't forget. Don't look innocent and say that I am scaring you. If this doesn't show my pain, I will give up. Then I will know you won't sympathize with me. Under the circumstances this is a mild reaction. You told me not to keep it inside. This is what is inside. It's not all that is inside. Also inside of me is your heart, the sunshine you are in my life. But it has to rain sometimes. Remember I love you.

Jacob Davis

Defendant and Bishop continued to date and in April of 1998, the two began to have sexual relations. Bishop testified that the Defendant seemed happier, although he continued to call her late at night or early in the morning, thinking that Creson would be at Bishop's house. Bishop and

Defendant attended the senior prom together in early May, and again she stated that Defendant appeared to be happy.

On the evening of May 18, 1999, Bishop and Defendant left work at Shoney's and went to Wal-Mart to purchase a pregnancy test for her. While there, Bishop told the Defendant that she had purchased a pregnancy test with Creson on a prior occasion. Upon hearing this information, Defendant fell to the floor and began crying and shaking uncontrollably. Bishop was able to console Defendant and the two left Wal-Mart between 10:30 and 11:00 p.m. Defendant and Bishop went to Bishop's house, where they had sexual relations, and Defendant left around 1:00 a.m.

The next morning, Defendant and Bishop met at Shoney's at 7:00 a.m. and then proceeded to take their physics final exam at 8:00 a.m. Bishop testified that the Defendant seemed to be in a good mood. Tiffany Roberts, Defendant's physics teacher, testified that the Defendant was joking around with other students. Roberts further testified that the Defendant was the first to finish his exam and that upon finishing, he asked her for some paper. The Defendant used this paper to write Roberts a three page letter, in which he berated her style of teaching and the school system. The Defendant further wrote about the pain he believed Roberts caused him, by discussing matters involving his relationships with Bishop, with the victim and with other students in Roberts' physics class. Defendant also wrote the following in the letter that he delivered to Roberts as he left her class at 9:45 a.m.:

* * *

If the opinions you have formed of me have been strictly based on my academic performance I highly regret and resent that you decided to make it a personal matter. Perhaps you knew what you were doing at the time and perhaps you did not. But you dealt me a very devastating personal insult earlier this year by discussing my personal life with that bastard Nicholas Creson (may his soul burn in eternal torment and the fires of hell itself) and the entire fourth period Physics class. You were a large part of the greatest pain I have ever known; a pain which nearly caused me to take my own life. With the help of my family I made it through this.

Before you decide to rip at a student's life, next time please reconsider. It might save someone the pain that I have experienced at your hands.

During the next period, approximately 10:00 a.m., Bishop and the Defendant met to clean out the locker that they shared. Bishop testified that, after they had finished cleaning out their locker, the Defendant walked her to her next class. As Bishop and the Defendant were walking, Nick Creson and Cassandra Sharp were walking behind them, when Sharp threw a penny and hit Bishop. The Defendant heard the penny hit the floor, so he turned around to find Creson standing behind them. Bishop testified that Creson said a few words to the Defendant, but the Defendant did not say anything back. Following this incident, Bishop went to her class, while the Defendant went to his drama class. In her testimony, Sharp stated that she apologized for hitting Bishop, and then she and Creson walked to class.

At approximately 11:30 a.m., Bishop was sitting in her pre-calculus class (which she took with Creson), when the Defendant came to the class looking for Creson. Bishop testified that when Creson arrived in class, the Defendant stood staring at him. Bishop stated that Defendant "had his fists clenched beside him, straight down. Just stiff. He had his eyes like in a gaze. Just staring. He didn't say anything. He wouldn't talk. He just watched [Creson] walk into class." Again, Bishop attempted to console Defendant. Bishop stated that she did not see Defendant anymore that day, but later learned that he had left school.

That afternoon, Allan Higgs was sitting in shop class (at approximately 1:45 p.m.) when he saw the Defendant back his car into a space in the parking lot by the athletic field house. The testimony at trial showed that Creson was a football player, and every day for the past three years, he had gone to the field house at 2:00 p.m. for seventh period practice. As the bell rang at 2:00 p.m. for seventh period, Nick Creson walked toward the field house. Because classes were changing, there were approximately 100-150 other students in the area surrounding Creson, including Brad Schrimsher, who was standing directly behind Creson. Cassandra Sharp testified that as she was walking to meet Creson (it was their custom to walk to seventh period together), she saw the Defendant step out of his car, raise a rifle to his chest, point it at Creson and fire a shot from a distance of approximately 30 to 40 feet. Creson fell to his knees, holding his books up as a shield and pleading with the Defendant to stop shooting. The Defendant moved closer and fired a second shot, which caused Creson to fall on his back. Defendant continued to approach and fired the third and final shot down into Creson's chest. After this final shot, the Defendant placed the gun down and sat down on the ground near Creson's body.

Thereafter, the police arrived and arrested Defendant. Detective Bill Wood of the Fayetteville Police Department testified that he retrieved a box of live ammunition from the front seat of the Defendant's car, along with a letter written by the Defendant and addressed to "Friends, Family, Tonya and all." The letter stated:

> I suppose when anyone reads this, I will be considered mentally insane. Those who really know me will confirm this is not the truth. Not by my standards. I have always believed since I was small that I do see the world through a totally unique set of eyes. However this is not the point here. I don't know what will happen to me this evening. I guess this will be goodbye should something happen to myself and I am not able to speak to those nearest to me.

Detective Wood was also given the murder weapon, a Marlin .22 caliber magnum rifle, which had been recovered by Ricky Byrant, a teacher at Lincoln County High School. Wood further testified that the Defendant fully complied with all of his instructions and that Defendant seemed to understand everything that was asked of him.

The Defendant presented proof from several witnesses, who testified regarding his behavior prior to the start of his senior year and after he began dating Tonya Bishop. Phyllis Davis, Defendant's mother, testified that on one occasion, the Defendant came home nervous and crying

4

because he had discovered that Tonya was still having a relationship with the victim. Mrs. Davis stated that she noticed cuts on the Defendant's wrists, and the Defendant stated that he was at the point of suicide. Mrs. Davis explained that she and her husband were able to calm the Defendant. She further testified that prior to his senior year, the Defendant was a gifted straight "A" student, active in his school, about to become an Eagle Scout and excited about going to college at Mississippi State. Mrs. Davis told the jury that, after the Defendant began dating Tonya, he stayed out late into the night, his grades dropped dramatically, he barely slept and was lethargic all of the time. Mrs. Davis stated that, in the two days leading up to this tragedy, the Defendant appeared happy and normal. She further told the jury that her husband kept about four guns in the house, including the .22 rifle used in this case. She testified that her husband kept the .22 loaded. She also stated that the Defendant had shot these guns prior to this shooting incident.

The Defendant presented additional testimony from Aletha Lewter, Susan Holder, Amy Moyers and Teresa Evans, who each testified as to the changes in Defendant's behavior and attitude after the start of his senior year and the dating of Tonya Bishop. Further, at trial, there was no issue as to whether the Defendant shot Nick Creson. In fact, the only contested issue at trial was Defendant's mental state at the time of the offenses. On this point, the jury also heard testimony from one psychologist and two psychiatrists.

Dr. William D. Kenner, a specialist in child and adolescent psychiatry, testified on behalf of the Defendant. Dr. Kenner testified that he interviewed the appellant and reviewed numerous records concerning the Defendant, including a report from a neuropsychologist, Dr. Pam Auble. He concurred in Dr. Auble's conclusion that Defendant was suffering from a severe depressive disorder. Specifically, he opined that the Defendant was suffering from "major depression, severe, with mood congruent psychotic features." The doctor further explained that the Defendant had a "genetic predisposition" for depression and mental illness, given that his father, paternal grandmother, his maternal grandmother and his aunt, suffered from severe depression and were hospitalized at some point for their mental illnesses. Dr Kenner explained:

> [I]t is important to recognize that while -- for a week before the shooting, Jacob had begun to hear voices, and these were voices that were talking to him in whispers. He thought it was somebody outside of him. And the voices were saying derogatory things to him.
>
> * * *
>
> [In] Jacob's case, he couldn't hear exactly what they were saying, but they were saying bad things about him. Occasionally they would say his name. And when he was alone and there was no possibility of anybody, you know, actually whispering, then he -- it really scared him.
>
> And as these events began to unfold, the voices would be loud at sometimes and more urgent and angry and so forth, and less so in others. And they were particularly

5

intense when he was at Wal-Mart and that was happening. And then they quieted down some. They started coming back very loudly after the penny incident and so forth.

Dr. Kenner further noted that the Defendant was experiencing, "what's invariably called emotional high-jacking, in which an individual is taken over by his emotions" and also auditory hallucinations. Dr. Kenner opined that Defendant "was already out of touch with reality before th[e] incident at Wal-Mart came up."

Finally, Dr. Kenner opined that Defendant's capacity to premeditatedly and intentionally shoot Creson "was severely, very severely impaired." Moreover, Kenner opined that mental capacity:

> is never -- I think it is never totally extinguished in anyone, but I think [Jacob] was operating on automatic. He was severely impaired at that time.

> * * *

> And further difficulty in -- with reflecting and deliberating comes from the fact that he was psychotic. He had difficulty distinguishing between what were his thoughts and what were external sensory input, so that he heard these voices like as if someone were whispering to him or about him. But these were really his thoughts. So that grasp on reality had really slipped from him. And so that, again, has very severe consequences when it comes to trying to think logically, because it, again, is like thinking in a dream. You know, you just can't put things together like they ought to be. And that is how someone like Jacob Davis would be functioning at that time.

In rebuttal, the State presented the testimony of Dr. Sam Craddock, a psychologist employed by the Forensic Services Division of the Middle Tennessee Mental Health Institute. According to Dr. Craddock, the Defendant was admitted under the institute's 30-day in-patient evaluation procedure and was evaluated by the institute for approximately twenty-seven (27) days (April 20 to May 17, 1999). On the basis of this evaluation and the social history compiled by Rebecca Smith, a psychiatric social worker employed by the Forensic Services Division, Dr. Craddock opined the that the Defendant:

> was experiencing a depressive disorder at the time. Was not severe to where I considered him to be psychotic or out of touch with reality or unable to accurately perceive reality. Nor to an extent that he was unable to form an intent.

He conceded that he had difficulty in rendering an opinion, since the team at the institute did not see the Defendant until eleven (11) months after the shooting incident. Dr. Craddock also opined that any auditory hallucinations experienced by the Defendant were due to "self-imposed" or "voluntary" sleep-deprivation. He concluded that, at the time of the murder, Defendant was capable of forming the requisite intent for premeditated first degree murder.

6

Dr. Rokeya Farooque, a psychiatrist employed by the Forensic Services Division, concurred in Dr. Craddock's opinion that Defendant was suffering from some "depressive disorder not otherwise specified." Dr. Farroque opined that 'at the time of the incident [Defendant] was not suffering from any kind of mental disease or defect that is going to make him incapable of forming intent." Moreover, she rejected Dr. Auble's and Dr. Kenner's diagnoses that Defendant was suffering from "major depression congruent with psychotic features" and that Defendant was suffering from auditory hallucinations. Dr. Farroque explained that interviews with Defendant and his friends and family reflected that at times the Defendant was sad and often felt bad, particularly since he was in jail facing such serious charges. Due to Defendant's depressive feelings, she diagnosed him as having some "depressive disorder not otherwise specified." She further explained that her interviews and testing of the Defendant revealed that the Defendant only complained once about hearing someone calling his name or whispering to him, which she did not believe was consistent with hallucinations (i.e., ". . .when [people] hear voices and the voices talk with them continuously or torment them, talk among themselves; argue among themselves.").

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his convictions for premeditated first degree murder, reckless endangerment, and possession of a weapon on school property. With respect to each of his convictions, Defendant contends that there is insufficient evidence to support a finding that he acted with intent, because he lacked the mental capacity to form the requisite mens rea for each conviction. The state argues that the evidence is sufficient to sustain each of the Defendant's convictions. Specifically as to the first degree murder conviction, Defendant argues that he did not have the mental capacity to form the premeditation necessary to commit the crime. We will first address the sufficiency of the evidence relating to Defendant's capacity to form the requisite intent for each crime, and then the sufficiency of the convicting evidence as to each crime.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Keough, 18 S.W.3d at 181 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). Questions regarding the credibility of the witnesses; the weight to be given the evidence; and any factual issues raised by the evidence are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

At trial, the Defendant did not present an insanity defense, which would have been an affirmative defense to each of the charges. The Defendant argued that, because of his mental condition, he lacked the requisite intent to commit first-degree murder, reckless endangerment and

7

carrying a weapon on school property. However, we observe that most, if not all of the testimony presented by the defense focused on negating the premeditation element of first degree murder. The Defendant presented testimony from several witnesses who testified to the changes in his behavior and attitude toward's school and life. The Defendant also offered the testimony of Dr. Kenner, who testified that, at the time Defendant committed these crimes, he was suffering from a severe depressive disorder. Dr. Kenner opined that this depressive disorder "severely impaired" the Defendant's capacity to premeditatedly or intentionally kill the victim.

To rebut Dr. Kenner's testimony, the State presented testimony from Dr. Craddock, who testified that the Defendant was sleep deprived and depressed, but he was capable of forming the requisite mens rea for premeditated first degree murder. Dr. Farroque also testified on behalf of the State, and stated that she was of the opinion that the Defendant was not suffering from a mental disease or defect which would have rendered him incapable of forming the requisite mens rea. Further proof showed that the Defendant wrote a letter, in which he stated, "I suppose when anyone reads this, I will be considered mentally insane. Those who really know me will confirm this is not the truth." The testimony of Tonya Bishop, Tiffany Roberts and Amy Moyers reflected that, on the morning of the shooting, the Defendant appeared normal and was joking with other students.

The jury determined that, at the time of these offenses, the Defendant was not suffering from any mental condition, which may have lessened his capacity to form the intent to commit the charged offenses. A jury verdict, approved by the trial judge, accredits the witnesses for the state and resolves any conflicts in the testimony favorably for the state. State v. Eaves, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997). The evidence was sufficient to prove, beyond a reasonable doubt, that the Defendant had the capacity to form the requisite intent to commit premeditated first degree murder. We also find that the proof established that the Defendant possessed the capacity to form the requisite intent to commit the other crimes stemming from this episode -- reckless endangerment and carrying a weapon on school property.

Having found that the Defendant was of sufficient mental capacity to form the required intent for the crimes charged, we next determine whether the State presented sufficient proof to establish that Defendant committed these crimes beyond a reasonable doubt. We find that the proof was sufficient.

## 1. Premeditated First Degree Murder

First degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (1997). "'[P]remeditation' is an act done after exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1997). The statute further provides that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. Yet, while premeditation requires that "the intent to kill must have been

8

formed prior to the act itself," "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (1997).

Moreover, the element of premeditation is a question for the jury which may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Tennessee courts have delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, Bland, 958 S.W.2d at 660, facts from which motive may be inferred, State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995), and calmness immediately after the killing, Bland, 958 S.W.2d at 660.

It is uncontested that the Defendant harbored feelings of jealousy and hatred for Nick Creson, which were shown through the letters Defendant wrote to Tonya Bishop and his teacher, Tiffany Roberts. In the letter written to Bishop, Defendant specifically stated that he wanted to "hear [Creson's] skin sear and pop under fire." Defendant also stated that he wanted "to put a three inch diameter hole in [Creson's] chest from a 12 gauge." Detective Bill Wood testified that he retrieved a Marlin .22 caliber magnum rifle from the crime scene. The proof further established that Defendant fired the rifle from thirty to forty feet away, then again from fifteen feet away. Finally, while the victim pleaded for his life, Defendant shot him at close range in the chest. Dr. Charles Harlan, the medical examiner, testified that the victim died from three gunshot wounds-- two shots to the chest and one to the abdomen. Based on this evidence, a reasonable jury could have concluded that the Defendant intentionally and with premeditation killed Nick Creson.

**2. Reckless Endangerment**

The evidence is also sufficient to support a conviction of reckless endangerment. Reckless endangerment occurs when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury" and is a felony when committed with a deadly weapon. Tenn. Code Ann. § 39-13-103. A person acts recklessly when he is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. Tenn. Code Ann. § 39-11-302(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under the circumstances as viewed from the accused person's standpoint." Id.

In this case, in order to support the conviction for reckless endangerment, the proof must show that Defendant acted recklessly by firing shots into a crowd of students and that Defendant's conduct placed or could have placed other students in imminent danger of death or serious bodily injury. Tenn. Code Ann. § 39-13-103(a). The evidence presented shows that at the time of the shooting, students at Lincoln County High were changing classes. Also, the record reflects that the shooting occurred in the parking lot, and that approximately 100 to 150 students were in this parking lot area at the time of the shooting. Brad Schrimsher testified that he was approximately thirty to forty feet directly behind Creson when the Defendant fired the first shot. After this shot, Schrimsher felt a burning sensation on his face and experienced a small amount of bleeding. Dr. Harlan testified that the two gunshot wounds to the victim's chest passed through the victim's body; one shot exited

through the victim's back shoulder blade. Thus, it can reasonably be inferred that one of the two exiting bullets grazed Schrimsher's face. The Defendant was aware of the other students within the proximity of the shooting, but consciously disregarded the possibility of bodily injury or death to any of these students. Therefore, based upon the evidence, we find that the proof was sufficient to convict the Defendant of reckless endangerment.

**3. Carrying a Weapon on School Property**

The evidence was sufficient to support the Defendant's conviction for carrying a weapon on school property. Tennessee Code Annotated section 39-17-1309 (b) specifically states that:

(1)      It is an offense for any person to possess or carry, whether openly or concealed, with the intent to go armed, any firearm, . . . . on any public or private school campus, grounds, recreation area, athletic field or any other property owned, used or operated by any board of education, school, college or university board of trustees, regents or directors for the administration of any public or private educational institution.

(2)      A violation of this subsection is a Class E felony.

Intent may be inferred from both direct and circumstantial evidence. State v. Washington, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983). The necessary intent to support a conviction for carrying a weapon with the intent to go armed may be proven by circumstances surrounding the carrying of the weapon. See Cole v. State, 539 S.W.2d 46, 49 (Tenn. Crim. App. 1976); Bennett v. State, 530 S.W.2d 788, 792 (Tenn. Crim. App. 1975). The purpose of going armed should be gathered from the facts of each particular case. Hill v. State, 298 S.W.2d 799 (Tenn. 1957).

At trial, the proof showed that the Defendant left school and went to his home to retrieve the firearm. Then, the Defendant returned to the school with the gun. The Defendant got out of his car with the gun and approached the victim. As he neared the victim, the Defendant began shooting. The final shot was at close range. Then, the Defendant sat next to the victim's body with the gun on the ground next to him. There was overwhelming proof that the Defendant carried the weapon on school property with the intent to go armed.

### B. Failure to Excuse Jurors for Cause

The Defendant contends the trial judge erred in failing to excuse six (6) potential jurors who stated they could not consider mitigating evidence, specifically, evidence of Defendant's mental state at the time of the shooting. We disagree.

From the record, it appears that defense counsel waived this issue at the motion for a new trial. The transcript reflects the following colloquy:

The Court:    Do you wish to address all of the issues which you have raised?

10

Mr. Fraley [Defense Counsel]:    That is the argument for each and every one of them, Judge.

The Court:    I also note that there is error cited on certain jurors.

Mr. Fraley:    On the 3 or 2?

Mr. McCown [Prosecutor]:    6 of them.

The Court:    In your motion filed on August 13th apparently you feel that error was committed in not excusing six.

Mr. Fraley:    I am waiving that, Judge. As it turned out I don't think it has merit.

The Court:    All right. Apparently Mr. Fraley is relying at least in this court in his argument primarily upon the sufficiency of the evidence.

Since defense counsel opted not to raise this issue at the motion for new trial, the issue is waived and cannot be raised for the first time on appeal. See Tenn. R. App. P. 3(e); see also State v. Zonge, 973 S.W.2d 250, 257-58 (Tenn. Crim. App. 1997). Even absent waiver of this issue, we find that the trial court properly qualified the six potential jurors. Initially, these six potential jurors stated they would have trouble considering certain mitigating evidence. However, the trial judge asked them additional questions, and each responded that he or she could follow the law and appropriately weigh the evidence presented in this case. The trial court accepted the potential jurors' answers and found them to be qualified. See State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993) (finding that the qualification of prospective jurors is within the sound discretion of the trial court). Further, the record reflects that five (5) of the potential jurors, while not stricken for cause, were removed by the Defendant's use of his peremptory challenges. The trial court's decision to not exclude the remaining juror, Lakisha Greenberg, was not an abuse of discretion.

The judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE

11

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 18, 2000

# STATE OF TENNESSEE v. JACOB LEE DAVIS

**Direct Appeal from the Circuit Court for Lincoln County**
**No. S-9800087     Charles Lee, Judge**

---

**No. M1999-02496-CCA-R3-CD**

---

**JUDGMENT**

Came the Appellant, Jacob Lee Davis, by and through counsel, and also came the Attorney General on behalf of the State, and this case was heard on the record on appeal from the Circuit Court of Lincoln County; and upon consideration thereof, this court is of the opinion that there is no reversible error in the judgment of the trial court.

It is, therefore, ordered and adjudged by this court that the judgment of the trial court is affirmed, and the case is remanded to the Circuit Court of Lincoln County for execution of the judgment of that court and for collection of costs accrued below.

Because it appears to the court that the Appellant, Jacob Lee Davis, is indigent, costs will be paid by the State of Tennessee.

**PER CURIAM**
Thomas T. Woodall, Judge
Jerry L. Smith, Judge
Robert W. Wedemeyer, Judge
