IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Jackson June 6, 2006

## STATE OF TENNESSEE v. WILLIAM H. GRISHAM, II

**Direct Appeal from the Criminal Court for Jackson County**
**Nos. 03-25, 03-26     J.O. Bond, Judge**

_____

**No. M2005-02072-CCA-R3-CD - Filed September 11, 2006**

_____

The defendant, Willam H. Grisham, II, was indicted on two counts of first degree premeditated murder, two counts of felony murder, and one count of especially aggravated robbery.  The jury returned not guilty verdicts on each count of felony murder.  The defendant was convicted of two counts of first degree premeditated murder and one count of especially aggravated robbery.  The trial court imposed consecutive life sentences for each of the murder convictions and a consecutive sentence of ten years for the robbery.  In this appeal of right, the defendant argues that the evidence was insufficient to support any of the three convictions.  The judgments of the trial court are affirmed.

### Tenn. R. App. P. 3; Judgments of the Trial Court are Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal), and Comer Donnell, Public Defender and Tom Bilbrey, Assistant Public Defender (at trial), for the appellant, William H. Grisham, II.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; Tom P. Thompson, District Attorney General; and Howard Chambers and Tiffany Gibson, Assistant District Attorneys General, for the appellee, the State of Tennessee.

### OPINION

On December 4, 2002, Detective Michael Smith of the Gainesville Police Department was dispatched to a residence in Jackson County regarding a possible shooting.  When he entered the residence, Detective Smith discovered the bodies of the victims, Ernest and Maybelle Stafford, seated in recliners in their living room.  At the time of their deaths, each of the victims had physical disabilities. Ms. Stafford had suffered a stroke, was unable to walk, and had no use of her arms.  Mr. Stafford had back problems and had suffered three heart attacks.

During the course of the investigation which followed, TBI Special Agent Russ Winkler interviewed the defendant, who had known the victims for about a year prior to their deaths and who had admitted that he had purchased the prescription drug OxyContin from them on prior occasions. The defendant claimed to the officer that he had been to the Stafford residence the day before the shooting and had been informed that they did not have any drugs available for sale at that time. He stated that he later acquired sixty or eighty forty-milligram pills of OxyContin from a man by the name of Chad Jones who, in turn, had claimed to have purchased the pills from a Bubba Fox. The defendant told the officer that he understood Fox had "killed a man for the pills."

After acquiring the statement from the defendant, Agent Winkler found a Chad Jones, who neither met the physical description provided by the defendant nor drove the vehicle the defendant had described. Agent Winkler then looked for others in the area by the same name but was unsuccessful in locating anyone. In a second interview by Agent Winkler, the defendant made a sworn statement claiming that he had illegally purchased two or three forty-milligram pills per week from the Staffords at thirty dollars each. He stated that shortly before the shooting, he had learned from Mr. Stafford that a Bubba Fox and Troy Pharris had threatened to kill him "if he (Mr. Stafford) even thought about turning them in" to the authorities. The defendant claimed that later on the same day, he saw Fox and Pharris who informed him that they "had took care of the one down there that was going to be doing all the narcing." The defendant told Agent Winkler that Pharris showed him a .22 or .32 caliber revolver. He also claimed that Fox told him "to keep my mouth shut or I'd be next." The defendant informed the officer that on the next day, he first learned that the Staffords had been murdered.

Agent Winkler acquired search warrants for the Pharris and Fox residences, conducted searches, and found nothing indicating that either of the two men were involved in the murders. Later, the officer was contacted by the defendant who claimed that two car loads of people wearing masks had blocked him in his driveway and had threatened to kill him if he talked any further to law enforcement.

One week after the murder, the defendant made a third statement to Agent Winkler admitting that he had lied about Chad Jones, Bubba Fox, and Troy Pharris. He acknowledged that he had never heard Ernest Stafford say that any of these men had threatened him. The defendant also admitted that he had lied about the two car loads of masked individuals. He told the officer that he actually owed Ernest Stafford money for drugs and claimed that he traveled to the Stafford residence in a vehicle driven by Mike Sizemore, who intended to buy some pills. The defendant contended that he gave Sizemore sixty dollars to purchase some "Oxy's in the forty size" and that while he waited outside in the vehicle, he heard two gunshots. The defendant told the officer that when he ran to the residence, he saw each of the Staffords slumped in their chairs and saw Sizemore with a gun in his hand. He contended that Sizemore, who was armed with a .22 caliber revolver, threatened to kill him and his family unless he kept his "mouth shut." The defendant told Agent Winkler that Sizemore, who had "a big wad of money" and "two big white bags of pill bottles" in his possession, handed him $2,000 in cash.

After taking this statement, Agent Winkler asked the defendant to wear a body wire in an effort to determine whether Sizemore might implicate himself in the shootings. On the trip from Carthage to Gainesboro, the defendant informed the agent that he had stolen his grandfather's .22 revolver that Sizemore used in the shootings. He claimed that he then traded the weapon to Sizemore for pills. The defendant also told the officer that his fingerprints would be on the weapon because he had actually fired it on a prior occasion. At that point, the defendant admitted that he still had possession of the revolver, claiming Sizemore had asked him to get rid of it after the shooting. The defendant informed Agent Winkler that he had buried the gun under his grandfather's barn and then led him to its location.

After gaining possession of the weapon, Agent Winkler advised the defendant of his Miranda rights. The defendant signed a waiver form and made another statement. While continuing to assert that Sizemore had killed the victims, he admitted to having stolen the weapon from his grandfather, but claimed he had traded it to Sizemore and then hidden it after the shootings. He explained that he feared telling the truth to the officer because "I was scared the gun had my fingerprints on it and if it was found it would look like I killed the Staffords." After this admission, the defendant declined to submit to a body wire in a conversation with Sizemore. After further discussion, he finally acknowledged that Sizemore had nothing to do with the shooting. In his final version, the defendant contended that he had driven to the Stafford residence on the night of the shooting, knocked on the door, and been confronted by Ernest Stafford, who possessed a shotgun. He claimed that Ernest Stafford accused him of "setting him up" and then raised his shotgun. The defendant told Agent Winkler that he then pulled his gun from his waistband and shot Ernest Stafford in the back of the head. He stated that when Mrs. Stafford was awakened by the noise, he shot her in the head. The defendant recalled that he grabbed the shotgun, unloaded it, and returned it to the bedroom, but left the shotgun shells on the coffee table. In an effort to "make it look like a robbery," he took $2,300 cash from Ernest Stafford's front pocket and took a paper bag of pills from the refrigerator. The defendant told the officer that the bag contained sixty to eighty Somas, three Lortab tens, and ten to fifteen OxyContin tens. The defendant admitted that he owed Ernest Stafford $235 for prior purchases of pills and acknowledged that he had acted alone in the shootings.

An autopsy established that Ernest Stafford died from a single gunshot to the back of his head. Mrs. Stafford died of a single gunshot wound to the right side of her head. The TBI determined that the bullets recovered from each of the victims were fired from the defendant's .22 caliber revolver.

The defendant first asserts that the evidence was insufficient for first degree murder because the state failed to prove premeditation. He next argues that the evidence was insufficient to support a conviction of especially aggravated robbery because the taking occurred after the victims had been shot.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the

reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The defendant first argues that the robbery did not appear to be the motive because nearly $40,000 in cash was found at the Stafford residence after the shootings. The defendant argues that there was no evidence the murders had been planned in advance. He contends that State v. West, 844 S.W.2d 144 (Tenn. 1992), stands for the proposition that any efforts toward concealment of a homicide is not proof of premeditation.

In State v. Keough, 18 S.W.3d 175 (Tenn. 2000), our supreme court described first degree murder as the "'premeditated and intentional killing of another.'" Id. at 181 (quoting Tenn. Code Ann. § 39-13-202 (a)(1) (1997)). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a)(1997). The element of premeditation is defined by statute:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). In Keough, our supreme court cited State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), as having identified circumstances from which the element of premeditation might be inferred:

> [T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; any threats or declarations of intent to kill made by the defendant; the procurement of a weapon; any preparations to conceal the crime which are undertaken before the crime is committed; and calmness immediately following a killing.

18 S.W.3d at 181.

Premeditation may, of course, be inferred from the circumstances of the killing. <u>Hicks v. State</u>, 533 S.W.2d 330, 334-35 (Tenn. Crim. App. 1975). The existence of premeditation is a question for the jury and may be established by the proof of the circumstances surrounding the offense. <u>State v. Suttles</u>, 30 S.W.3d 252, 261 (Tenn. 2000).

In this instance, there was nothing other than the claim of the defendant to indicate that Mr. Stafford was armed. Further, the defendant admitted that he was armed when he entered the Stafford residence. He acknowledged that he shot Ernest Stafford in the back of the head and then shot Mrs. Stafford when she was awakened by the noise. The defendant, who conceded that he owed the Staffords money and had driven to their residence in order to illegally purchase drugs, was armed with a revolver when he confronted the couple. After the shootings, the defendant took $2,300 in cash from the pocket of Ernest Stafford and removed several prescription pills from the refrigerator. That the defendant disposed of the empty shells, reloaded the weapon, wiped off his finger prints and buried the revolver underneath his grandfather's barn implies a degree of calmness after the shooting. In our view, these circumstances adequately establish the element of premeditation.

Robbery is the intentional or knowing theft of property from the person of another by violence or by putting the person in fear. Tenn. Code Ann. § 39-13-401(a) (1997). When a robbery is accomplished by a deadly weapon and the victim suffers serious bodily injury, the robbery is especially aggravated. Tenn. Code Ann. § 39-13-403(a). The defendant admitted taking the money and the prescription drugs. Because the Staffords were murdered, the defendant was able to steal the cash and the drugs. In <u>State v. Shawnda James</u>, No. 01C01-9803-CC-00093 (Tenn. Crim. App., at Nashville, Aug. 11, 1999), a panel of this court was not persuaded by an argument that the defendant was only guilty of theft because there was no intention to steal by violence or by placing the victim, whom she had shot and killed, in fear. The circumstantial evidence here refutes the contention of the defendant. Further, the defendant owed the victims money, he regularly used the addictive drugs that he typically acquired from the victims, and he searched the refrigerator for drugs before leaving the residence. That suggests that the defendant was motivated by his desire for the money for the drugs or for both. In our view, the evidence of the robbery was sufficient.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-5-