IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2002

## STATE OF TENNESSEE v. WILLIE JOHNSON

**Direct Appeal from the Circuit Court for Madison County**
**No. 00-128    Donald H. Allen, Judge**

---

**No. W2001-02929-CCA-R3-CD  - Filed January 14, 2003**

---

The defendant appeals his convictions of burglary and theft of property over five hundred dollars ($500.00). The defendant argues that the State did not present sufficient evidence at trial to support his burglary conviction and contends that he did not receive a speedy trial. We affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Joseph Patterson, Jackson, Tennessee, for the appellant, Willie Johnson.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On February 7, 2000, the defendant, Willie Johnson, was indicted for the burglary of the Pesce Architecture Firm, in violation of Tennessee Code Annotated section 39-14-402, and theft of property over five hundred dollars ($500.00), in violation of Tennessee Code Annotated section 39-14-103. Following a jury trial, the defendant was convicted of both offenses and sentenced to eight years for burglary and four years for theft, to be served concurrently. The defendant filed a Motion for Judgment of Acquittal or Motion for New Trial. The trial court heard and denied the motion. The defendant filed a timely notice of appeal, contending that the State did not present sufficient evidence at trial to support his burglary conviction and that he did not receive a speedy trial.

# I. Facts

The defendant's jury trial was held on June 26, 2001. The State called John Mann, Tony Concialdi, Jim Murdaugh, Officer James Randall Price, Officer David Knolton, Sergeant Ron Jackson, and Officer Randy Lampley to testify to the events surrounding the November 9, 1999 burglary of the Pesce Architecture Firm. At the conclusion of the State's case, the defense counsel moved for a Motion for Judgment of Acquittal. The trial court denied the defendant's Motion for Judgment of Acquittal, finding that sufficient proof existed placing the defendant in the area of the burglary and based upon eyewitness testimony. The defense called Wade Powell and recalled Tony Concialdi, Jim Murdaugh, and Officer James Randall Price.

John Mann, an architect with the Pesce Architecture Firm,[1] testified to the circumstances of the November 9, 1999, burglary of his office building in downtown Jackson. He had locked the doors prior to leaving for lunch that day. After returning from lunch, he discovered that the outer and inner doors of his office building were ajar and wood chips were broken from the door trim. Once inside his office, he saw that approximately thirty computer discs, compact discs, and software were missing from his workspace. Mann stated that some pens from his desk were missing, as well as the cord from Jerry Pesce's Norelco shaver. During this time, he received a telephone call from someone at Ironworks,[2] a business associated with his firm, inquiring about whether the Pesce Firm was missing a computer. He found that the laptop belonging to his employer, Jerry Pesce, was missing. Mann stated that he went to Ironworks and recovered the missing property. Mann stated that the Pesce Firm offices were accessible by doors located inside the building, as well as doors on the outside of the building. He stated that employees of an insurance company, located in the same building as the Pesce Firm, were the only people having access to the inner offices. Mr. Mann testified he did not know who could have committed the crime and stated that he did not know the defendant.

On cross-examination, Mann testified to what he discovered on the day of the burglary. He stated that the value of the music compact discs ranged from fifteen dollars to twenty dollars each. At the time of the theft, the laptop was worth approximately four thousand dollars, and each of the software computer discs were worth one hundred to two hundred dollars each. He stated that the stolen items belonged to the Pesce Firm and were purchased for business purposes. He stated that no damage was done to any of the items taken from his office. He also stated that it appeared as if someone used an object to chip the wood from the door frame. He stated that the police photographed the crime scene, but he did not remember telling them about the damage to the doors. He stated that he has worked for the Pesce Firm for six years.

On redirect, Mann stated that the outer door of the office sustained damage from the apparent forcible entry. He also stated that the Pesce Firm doors are located on the west and east side of the

---

[1] Pesce Architecture Firm is also referred to as the Pesce Firm.

[2] Ironworks is also known as Ornamental Iron, Ornamental Iron and Construction, and Ornamental Ironworks.

building and his office is located on the east side of the building. He stated that the west side of the building houses the insurance company that he previously mentioned. He stated that if the west or east door is unlocked, one can make entry into the building and that he has access to his office from the east door or the west door.

Tony Concialdi, owner of Ornamental Iron and Construction, testified, as follows, regarding the incident at issue. Ornamental Iron and Construction, also known as Ironworks, is located in the downtown area of Jackson near the Pesce Firm. He stated that at approximately 12:30 to 1:00 p.m. on the day of the burglary, the defendant walked into Concialdi's office with a laptop computer and other items. Concialdi stated the defendant approached Concialdi and Jim Murdaugh, who was also present. He stated he remembered the defendant allowed him and Murdaugh to open and operate the laptop. He noticed that the tried to plug a shaver cord into the computer. He stated that after the laptop was turned on, the screen flashed the words, "Pesce Firm," and required a password for further operation. He stated that he told the defendant that "you can't just turn it on and get in there." The defendant then told him to use the computer discs to gain access. He stated that he told the defendant that the computer was not accessible by only using the discs. He stated that he told the defendant that he did not think the laptop belonged to the defendant. After the defendant told him that he bought the laptop, Concialdi remembered responding to the defendant by saying, "Well, I don't know about that." The defendant then gathered the laptop and computer discs and left. He stated that Murdaugh then called the police. Concialdi identified the defendant as the person who attempted to sell him the laptop and discs.

On cross-examination, Concialdi reiterated his previous testimony. He stated that the defendant was the man who attempted to sell him the stolen items. He stated that, by the time the police arrived at his office, the defendant was gone. He described the perpetrator as a black male, approximately six feet tall, with a goatee. He stated that he told one of the officers that the perpetrator was a black male with a stubby beard and mustache. He described his office as the "old Goodyear building." He stated that he uses half of the old Goodyear showroom as his office and he uses the rest of the building for his shop. He stated that the lighting conditions in his office were sufficient to see the defendant from three feet away. He stated that the defendant stood directly across from him on the opposite side of his desk for approximately ten minutes. He positively identified the defendant as the same person who appeared in his office. On redirect, Concialdi testified that he has no doubt that he correctly identified the defendant as the perpetrator.

Jim Murdaugh testified that the defendant attempted to sell him the stolen goods on the day of the burglary. At the time of trial, he stated that he was employed as a certified real estate appraiser at an office on Main Street in Jackson. He stated that he was in Concialdi's office when he noticed the defendant walk up from the street and then enter Ironworks, carrying a black laptop. He stated that the defendant asked the two men if they would be interested in buying his laptop for five hundred dollars ($500.00). He remembered telling the defendant to go into Concialdi's office so the men could ascertain whether the computer was in good condition. He stated that he observed the defendant demonstrate how to operate the computer. He stated that Concialdi and his son were in the office with him and the defendant. He remembered seeing the address of Jerry Pesce, Pesce

Architects, printed on the front cover of the laptop case. He stated that the defendant attempted to plug in the computer with a Norelco shaver cord. He then asked the defendant to turn the computer on to see if the computer worked. He stated that the computer screen flashed a Windows screen, then flashed the words, "Pesce Architect Firm," before asking for a password. He stated he told the defendant to give them a password to demonstrate how the laptop operated, but the defendant did not have the password. Murdaugh stepped outside and called his wife, who is employed with the police department, to request police assistance and to report what was happening in Concialdi's office. He stated that he assumed that the defendant heard him make the call, because the defendant ran out the front door with the stolen goods. While gathering the laptop and discs, the defendant picked up a compact disc belonging to Concialdi. After making the call to his wife, Murdaugh called the Pesce Firm to see if they were missing a laptop computer. He stated that during the time that the police were apprehending the defendant, Mann came from the Pesce Firm to reclaim the laptop and other items. The police asked the men for a description of the perpetrator and, in less than thirty minutes, returned to Concialdi's shop with the defendant in their squad car. He reported to the police that the defendant was thin, with a goatee, and described what the defendant was wearing. He stated that all of the events happened during the lunch hour. He identified the defendant as the man who attempted to sell the stolen merchandise.

On cross-examination, Murdaugh testified to reporting the incident to the police. He gave the description of the perpetrator as thin, with a goatee. He remembered seeing three police officers on the scene. He stated that the defendant entered Ironworks from the direction of the grocery parking lot and walked through the first garage door positioned on the west side of the building. He stated that it alarmed him when he saw the defendant carrying a laptop as he passed alongside his truck because Murdaugh's laptop was inside his unlocked truck, parked between the garage door and the street, just outside Ironworks. He realized that the defendant did not look like a computer salesperson, but chose not to turn the defendant away because he wanted to determine whether the laptop was taken from his truck. He stated that when the defendant showed the men the Gateway computer with its screen flashing, "Pesce Architect Firm," he knew that it was not his laptop. He stated the defendant did not know how to turn the computer on, so Concialdi had to do this for him. He stated the defendant also tried to use a Norelco shaver cord on the computer. Because Murdaugh stepped around the corner of the office to discreetly use his cell phone to call the police department and the Pesce Architect Firm, he did not see the defendant leave the building. He stated that he had an opportunity to see the defendant again in the back of the squad car. He remembered that the defendant was in the backseat, and the defendant was yelling obscenities at him. He recognized the person in the squad car as the same person who attempted to sell the men the laptop and other stolen items.

Officer David Knolton, who had been employed as a patrolman for the Jackson Police Department for eleven years, testified to the events of November 9, 1999. He stated that he heard the dispatch that requested an officer in the area around Ironworks. Once he finished with his

business, he drove in the direction of Ironworks. He stated that another officer dispatched a BOLO[3] for a black male, slim, with a goatee, wearing blue jeans. He began to look for the suspect. He stated he saw a man, meeting the description, in the alley behind the "old Vet's Club" on 425 North Royal Street and then informed dispatch. He stated he stopped the defendant and asked for his identification. Officer Colon arrived as Knolton spoke to the defendant. At this time, the defendant had no property in his possession. He stated that the area in which the defendant was stopped was approximately a block or a block and a half from Ironworks. He stated that after leaving Officer Colon with the defendant, he went to Ironworks to speak to Concialdi and Murdaugh. While speaking to Concialdi and Murdaugh, Officer Colon arrived at Ironworks with the defendant in the back of his squad car. He stated that Officer Colon brought the defendant to Ironworks to allow Concialdi and Murdaugh the opportunity to determine if the suspect in custody was the same person who attempted to sell the men the laptop computer. He stated that he was advised by dispatch that the subject he had stopped had been identified as the suspect by the men at Ironworks. He stated that after leaving Ironworks, he started an immediate search of the area where he stopped the suspect. He stated that Sergeant Ron Jackson met him on the scene and helped in the search, and Sergeant Jackson found the laptop and other items in a dumpster. He stated that he noticed that the dumpster and the suspect were a block and a half from Ironworks, and upon completion of the search, he went to Ironworks. He stated that he positively identified the suspect that he stopped on November 9, 1999, by pointing at the defendant in the courtroom.

On cross-examination, Officer Knolton testified to the description and information given by the police dispatch. He stated that he had been looking for a slim, black male, with a goatee, and wearing blue jeans. He stated that the suspect was reported as leaving Ironworks in a northern direction, which would have placed him in the area of the Vet's Club. He stated he saw the defendant walking north, up the alley, near North Royal and College Street. He stated he saw the defendant beside an automobile repair shop located on 425 North Royal Street around two o'clock in the afternoon. The suspect was identified as Willie Johnson. He stated that after Officer Colon arrived, he went to Ironworks to speak to Concialdi and Murdaugh. He stated that Officer Colon kept the defendant in the area where he was stopped and that Officer Colon placed the defendant in his squad car and went to Ironworks. He stated that he and Sergeant Jackson searched the area where the defendant was first spotted. Sergeant Jackson found the laptop and other items in the dumpster behind 425 North Royal Street. He stated that he took these items to Officer Price's location on Hurt Street and College Street, and the items were returned to the owners. He stated that he also questioned employees of the auto shop located at 425 North Royal Street. He testified to typing a supplement to his report reiterating the events leading to the arrest of the defendant. He stated in this supplement that the suspect had a stubby beard because he received this information from the dispatch of the BOLO.

On redirect, Officer Knolton acknowledged that he filed a handwritten report to the police pepartment. Officer Knolton said that the handwritten report was later reduced to a typewritten report, introduced by the defense counsel. On recross, Officer Knolton was asked how his name

---

[3] BOLO refers to a dispatch to police officers to "be on the look out."

appeared on a report written by Officer Price. He stated that Officer Price wrote his name in his report.

At this point in the trial, the defense counsel asked the jury to be excused, and the trial judge excused the jury. The defense counsel told the judge that the defendant was demanding that he ask witnesses questions that counsel felt were inappropriate. The trial judge addressed the defendant and asked the defendant what his contentions were in respect to witness questioning. The defendant stated that he wanted reports by witnesses read in full, not read in portions, so the jury could hear that the reports differed as to the description of the suspect. The trial judge asked the defendant to allow the defense counsel to ask questions on redirect, to recall witnesses, and to have the opportunity to make his argument before the jury. The trial judge also admonished the defendant for speaking so loudly. The defendant then announced to the trial judge and his counsel that, "I've got ya'll now. Ya'll want me out of here." The bailiff then told the defendant, "No. We just want you to sit down." The defendant replied that he "got the message," and he knew exactly what was "going on." The defense counsel asked the defendant if he wanted to be the lead attorney and question the witnesses. The defendant responded to his counsel by stating that he wanted to ask questions that counsel may not want to ask. The defense counsel again asked the defendant if he would like to take over the cross-examination and told him he could not "do it piecemeal." The trial judge responded to the exchange between the defense counsel and defendant by stating that the defense counsel would continue to represent the defendant and that the defendant may confer with his attorney. However, the defense counsel should only ask those questions which he felt were appropriate. The trial judge dismissed the court for a five-minute break.

Sergeant Ron Jackson testified to the events of November 9, 1999. He was working the day shift from 7:00 a.m. until 3:00 p.m., in the location of Lane Street from the Forked Deer River Bridge and east of Highland, when he received a call that a subject was trying to sell items that were probably stolen. He stated that he went to Ornamental Iron on East College and was given a description of the suspect. He remembered that one of the officers remained at the shop while he and another officer left to find the suspect. After Officer Knolton found the subject, he returned to Ornamental Iron. He stated that Officer Colon transported the subject back to Ornamental Iron for Concialdi and Murdaugh to identify the suspect in custody. He stated that Concialdi and Murdaugh positively identified the suspect as the man attempting to sell them the laptop and other items. He stated that he found the laptop computer inside a carrying case and a black plastic bag with software items inside the bag. He stated that Concialdi and Murdaugh identified the laptop computer as the same one the suspect attempted to sell to them. He said thatOfficer Knolton was given the items to return to the owner, and the defendant was transported to the jail. He identified the defendant in the courtroom as the same man who was taken into custody on November 9, 1999. He stated that the items were found in an area located two blocks from Ornamental Iron and that he was not familiar with the location of the Pesce Architectural Firm. He stated that, on the day of the burglary, he searched for a tall, slender black male with a scraggly beard and black hair. He stated that at the time he received a description of the suspect, the owner of Ornamental Iron described the suspect as having a small goatee around his chin. As the District Sergeant, he made the decision not to have fingerprints taken from the items found in the dumpster. He testified that the BOLO from Officer

Price described the suspect as a black male with a stubby beard, but Concialdi described the suspect as having a goatee and did not think the goatee description went out on a BOLO.

Officer James Randall Price, a police officer with the Jackson Police Department for twenty-two years, was called as a witness to present testimony as to the events of November 9, 1999. He testified that he went to Ornamental Ironworks in response to a call regarding items believed to be stolen. He stated that he spoke with Concialdi, the owner of Ornamental Iron, and Murdaugh and then made a report based upon the information given. He also stated that he dispatched the description of the suspect as a black male with a scruffy-looking beard and mustache. He said he remained at Ornamental Iron while other officers looked for the suspect. Approximately fifteen minutes passed before the suspect was brought back to Ornamental Iron for identification. He testified that he did not know the defendant prior to his arrest and positively identified the defendant in the courtroom as the same person the officers brought back to Ornamental Iron for identification purposes. He stated that he photographed the laptop and other items before the items were returned to the owner.

On cross-examination, Officer Price testified to the contents of his supplemental report. He stated that he wrote the original report. Concialdi told him that the suspect, a black male with a scrubby beard and mustache, came into his store and attempted to sell him a computer. After getting the description of the suspect, Price stated that he sent out a BOLO for a black male with a scrubby beard. He testified that the Jackson Police Department chose not to dust for fingerprints on the items retrieved from the dumpster. He stated that when an officer returned to Ornamental Iron with the defendant in the squad car, Murdaugh positively identified him as the man who attempted to sell him the laptop and other items.

After the trial judge released the jury for lunch, the defense counsel addressed problems that he was having with the defendant. The defense counsel told the judge that the defendant was asking him to do things that were impermissible. The trial judge dismissed the parties for lunch.

The State called Officer Randy Lampley, of the Jackson Police Department, as a witness. At the time of the trial, he stated that he was in charge of the Financial Crimes Unit of the Jackson Police Department. During November of 1999, he was in charge of the Property Crimes Section. Lampley positively identified the defendant in the courtroom as the same person he saw on November 10, 1999. He testified that on the day after the burglary, he went to the Pesce Firm to take pictures of the damage to the door facings and to speak to John Mann. He said that all of the property that was stolen on November 9, 1999, had been returned to Mann on the same day. He stated that the Pesce Architectural Firm is located halfway down Sycamore Street, Jackson, Tennessee, in an old railroad building that has been converted into downtown office buildings.

On cross-examination, Lampley testified that he did not ask Mann to identify the defendant from either a photo lineup or a live lineup. He stated that it was not unusual to return stolen items to the owner or to show the owner photos of stolen items for identification purposes. He tsetified that it was possible for fingerprints to have been lifted from the stolen items, but they did not dust

for prints.  On re-direct, Lampley stated that he was not directly involved with the stolen property on November 9, 1999.

The defense then called Wade Powell, owner and operator of Powell's Auto Shop on 425 North Royal Street in Jackson, to testify concerning his knowledge of the incident occurring on November 9, 1999.  Powell stated that the defendant had been in his shop prior to his arrest and that the stolen items were found in a dumpster located approximately fifteen to twenty feet outside the back door of his shop.  He told the police that the defendant would sometimes come in his shop, and he did not see the defendant with any of the stolen items on the day of his arrest.

On cross-examination, Powell testified that, although he  was not sure of the time of day the defendant was in his shop, he thought it was sometime after nine o'clock in the morning.  He stated that the defendant was in the auto shop for about ten to fifteen minutes.  He said that when the defendant left the shop, he did not have anything in his possession, and he did not return until he was in police custody.  He testified that when the stolen items were found, he was inside of his shop and was unaware that the police had found them in his dumpster. On redirect, Powell testified that he did not see the defendant until after the police arrested him that afternoon.  He stated that his cousin was outside the shop on the day of the defendant's arrest.

The defense recalled Tony Concialdi.  Concialdi stated that he did not give a signed written statement, but told Officer Price that a black male with a stubby beard and mustache attempted to sell him a laptop computer and several CDs.  Concialdi stated that he was in his office when the defendant left the store. He also stated that he did not hold the defendant in the shop while Murdaugh used his cell phone or until Murdaugh returned.  He stated that the defendant appeared to get nervous and left the shop when Murdaugh went outside to use his phone.  He said he noticed the defendant left, he also picked up some of Concialdi's CDs.  On cross-examination, he stated that the CDs that the defendant picked up from his desk were returned when the police brought the other property to his shop.

Jim Murdaugh was recalled by the defense and testified that the defendant tried to sell the laptop computer to him for five hundred dollars ($500.00).  The defense counsel read into the record the statement prepared by Officer Price and asked Murdaugh if the report was correct.  He responded by stating that Officer Price's statement was correct.  He stated that he talked with the defendant prior to his entering Concialdi's shop, but Officer Price did not include this in his report. He also stated that the defendant offered to sell him the laptop while he and the defendant were outside Concialdi's shop.

Officer Price was recalled by the defense counsel.  He stated that he failed to include Murdaugh's statement regarding the defendant's offer to sell him the laptop for five hundred dollars ($500.00).  He also stated that he did not have any reason to explain differences in Officer Knolton's description of the defendant and Concialdi's description.  He stated that Concialdi told him that he had been in the office, walked out, and then returned to see the defendant head north on Hurt Street.

He testified that his report was not written "word for word" to record the witnesses' statements, but was written from memory and from notes he made as witnesses reported to him.

On redirect, Officer Price testified that Concialdi originally gave a description of a suspect with a mustache and a stubby beard. He remembered that other officers came to the scene and dispatched the description over the radio. He said that Sergeant Jackson may have talked to Concialdi and received information from him as well. The defense counsel rested and renewed its Motion for Judgment of Acquittal. The trial court dismissed the motion and instructed the jury.

## II. Analysis

### A.        Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his conviction of burglary, in violation of Tennessee Code Annotated section 39-14-402. The defendant contends his burglary conviction was based upon circumstantial evidence and that another hypothesis existed to explain how he came into possession of the stolen items.

When a defendant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999), see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (Tenn. 1979); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based on direct, as well as circumstantial, evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977). In determining the sufficiency of evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Furthermore, the jury must determine the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. State v. Land, 34 S.W.3d 516, 533 (Tenn. Crim. App. 2000). We must review the evidence in the light most favorable to the State to determine if "'ant rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). A guilty verdict in criminal actions shall be set aside on appeal only if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e).

The defendant was indicted and convicted of burglary in violation of Tennessee Annotated section 39-14-402. Burglary is defined as:

  (A) A person commits burglary who, without the effective consent of the property owner:

  (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft,or assault;

  (2) Remains concealed, with the intent to commit a felony, theft,or assault, in a building;

  (3) Enters a building and commits or attempts to commit a felony, theft, or assault; or

  (4) Enters any freight or passenger car, automobile, truck, trailer, boat, airplane, or other motor vehicle with intent to commit a felony, theft, or assault or commits or attempts to commit a felony, theft, or assault.

Tenn. Code Ann. § 39-14-402(a) (1997).

When viewed in the light most favorable to the State, the evidence was sufficient to prove the defendant was guilty of burglary. Mann reported to the Jackson Police Department that, during the lunch hours on November 9, 1999, the door to his office had sustained damage as the result of forcible entry. Upon entering the Pesce Architecture Firm, Mann noticed that a laptop computer and several other items were missing. Within the same time frame, Concialdi and Murdaugh encountered the defendant in Concialdi's office with a laptop computer and other items they believed to be stolen. Within minutes after Murdaugh's call to police, the defendant was apprehended near Concialdi's office. The police found the laptop computer and other stolen items in a dumpster in the alley where the defendant was apprehended. The "unexplained possession of property recently stolen in a burglary will support a conviction for that burglary." Smart v. State, 544 S.W.2d 109, 110-11 (Tenn. Crim. App. 1976). However, the jury must have determined whether the State carried its burden of proof as to the defendant's identity. See State v. Vaughn, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Here, the defendant was identified as recently having been in possession of stolen property and was stopped and apprehended within feet of the dumpster where the stolen items were discovered. Based upon the evidence presented at trial, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

The defendant alleges that Mann's testimony supports an alternative hypothesis as to how the defendant came into possession of the stolen items. Mann testified that the defendant said "he had bought the lap top computer." The defendant argues that the jury failed to consider an alternate explanation of how he came into possession of the stolen property. The evidence in this case clearly established that the defendant was seen by Tony Concialdi and Jim Murdaugh in Concialdi's office at Ornamental Iron. All of the witnesses positively identified the defendant as the same person attempting to sell stolen goods and in possession of the stolen goods. A conviction may be based entirely on circumstantial evidence where the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). In the instant case, the finger of guilt is pointed at this defendant and this defendant alone. The

defendant's alternate hypothesis that he bought the laptop computer is simply implausible. Given that we must view the evidence in the light most favorable to the State, we conclude the evidence was sufficient to convict the defendant.

## B. Dismissal of Indictment - Right to a Speedy Trial

Next, the defendant argues that the trial court erred by failing to dismiss the indictment against him, thereby violating his right to a speedy trial and due process.

The defendant was arrested on November 9, 1999. On November 18, 1999, the defendant waived his right to a preliminary hearing, and the case was bound over to the Madison County Grand Jury. The defendant filed a pro se Motion to Dismiss, alleging an unnecessary delay in bringing his case to trial, and requested the trial court dismiss the indictments relating to his November 9, 1999, arrest pursuant to Tennessee Criminal Rule of Procedure 48(b). The trial court denied this motion on May 1, 2001. On February 7, 2000, the Madison County Grand Jury returned an indictment for burglary, in violation of Tennessee Code Annotated section 39-14-402, and for theft over five hundred dollars ($500.00), in violation of Tennessee Code Annotated section 39-14-103. The defendant was sentenced to prison for eight years for the burglary conviction and to four years for the theft conviction, to be served concurrently.

We use the abuse of discretion standard of review in determining whether the trial court correctly applied the four-part balancing test to the defendant's claim that his right to a speedy trial was violated. See State v. Jefferson, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996). Specifically, the standard of review for a trial court's decision to dismiss an indictment, the remedy for a successful claim of a speedy trial violation, is abuse of discretion. See State v. Harris, 33 S.W.3d 767, 769 (Tenn. 2000). This standard of review "contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000), (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)). Therefore, we turn our attention to the facts regarding the defendant's assertion that the trial court erred in not dismissing his indictment.

The defendant contends that the trial court should have dismissed his indictment due to the eighteen-month delay in bringing him to trial. Every criminal defendant is statutorily and constitutionally entitled to a speedy trial. U.S. Const. Amend. VI; Tenn. Code Ann. § 40-14-101. There are four factors to consider when assessing whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice suffered by the defendant as a result of the delay. State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). For the court to consider these factors, there must have been a delay "which is presumptively prejudicial." Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L. Ed. 2d 101 (1972). Furthermore, the delay must "approach one year" to trigger an analysis of the factors, although "the line of demarcation depends on the nature of the case." Utley, 956 S.W.2d at 494. If the court determines that the defendant was denied his right to a speedy trial,

constitutional principles behoove the court to reverse the conviction and dismiss criminal charges. State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973). Before we discuss whether the evidence was sufficient to uphold the defendant's convictions, we must consider whether the defendant's indictment should have been dismissed.

### (1)    Length of the Delay

First, this Court must examine the length of the delay to assess whether the defendant's right to a speedy trial has been violated. The defendant was held in custody from the time of his arrest in November of 1999 to the time of his trial in June of 2001. In the instant case, the defendant was held for eighteen months, triggering this Court's analysis of the aforementioned factors.

### (2)    Reason for the Delay

Second, we must look to the reason for the delay in bringing the defendant to trial. Reasons for the delay of prosecution fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused by, or acquiesced in, the defense. State v. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996).

The record does not reflect the State's intention to delay to delay proceedings in order to gain a tactical advantage over the defense or to harass the defendant. However, the State and defendant agree that the reason for the delay is unclear. The State has proposed there was a problem with the Sheriff's Department getting the defendant back to court for his arraignment. At the hearing, the State argued:

> [H]e was indicted, and we leave it up to the Sheriff's Department to apprehend the defendants. When we were contacted in our office in November and December of 2000 . . . we set up the Court date for him to be brought back in January. There was a go get done, and he was brought back. When we were - General Woodall received mail from the defendant, we brought him back. But as far as, you know, the actions of the Sheriff's Department or in bringing him here on the indictment, I can't speak for that, Your Honor.

The State's inability to offer any reason for the delay in bringing the defendant to trial is evidence of bureaucratic indifference. In Bishop, the prosecuting attorney made a diligent effort to provide the defendant with a speedy trial, but the court held that the duty to bring the defendant to trial is "a duty imposed on the State through all agencies and departments affecting the administration of justice." Bishop, 493 S.W.2d at 84. The Bishop court went on to quote the U.S. Supreme Court in Dickey v. Florida by stating that the "public officials responsible for the delay may not even be associated with law enforcement agencies or the courts," and a delay that springs from the "refusal by other branches of government to provide these agencies and the judiciary with the resources necessary for speedy trials" will be considered against the State. Bishop, 493 S.W.2d at 84 (quoting Dickey v. Florida, 398 U.S. 30, 51, 90 S. Ct. 1564, 1575, 26 L. Ed. 2d 26 (1970) (Justice Brennan

concurring)). The State concedes being uncertain about the eighteen-month delay in bringing the defendant to trial. We construe this factor against the State.

### (3) Defendant's Assertion of the Right to a Speedy Trial

Third, the Tennessee and United States Supreme Court have both recognized that "an accused who is unaware that charges are pending against him or her, as is often the case where an indictment has been sealed and not served, cannot be penalized for his or her failure to assert the speedy trial right." State v. Wood, 924 S.W.2d 342, 348, n.13 (Tenn. 1996) (citing Doggett, 505 U.S. at 652-54, 112 S. Ct. at 2691). The defendant filed a pro se Motion to Dismiss, pursuant to Tennessee Rule of Criminal Procedure 48(b), demanding his right to a speedy trial in December of 2000, after being indicted in November of 1999. The State relies upon the holding in State v. Daugherty, in that this defendant waited over thirteen months to assert his right to a speedy trial. See State v. Jimmy Wesley Daugherty, 1989 Tenn. Crim. App. LEXIS 617, CCA No. 89-26-III, Montgomery County (Tenn. Crim. App. filed September 22, 1989, at Nashville). Daugherty differs from the instant case in that the defendant in Daugherty did not file his motion to dismiss until he learned of the State's intention to re-indict him to pursue a count of habitual criminality. See id. The defendant in the instant case filed his Motion to Dismiss without the aid of an attorney, and the record reflects that the defendant wrote letters to the State regarding his incarceration. Because this defendant asserted his rights to a speedy trial on more than one occasion and in a timely fashion, this factor weighs heavily against the State.

### (4) Prejudice Suffered by the Defendant

Fourth, the defendant must have suffered some prejudice caused by the delay. This fourth factor, regarding prejudice, is viewed in light of the interests of defendants, which the right to a speedy trial was designed to protect. In Smith v. Hooey, the United States Supreme Court listed the following three interests the right of a speedy trial is designed to protect: (1) to prevent undue and oppressive incarceration prior to trial, (2) to minimize anxiety and concern accompanying public accusation, and (3) to limit the possibilities that a long delay impairs the ability of the accused to defend himself. See Smith v. Hooey, 393 U.S. 374, 89 S. Ct. 575, 21 L. Ed. 2d 607 (1969). The defendant contends that, due to the passage of time, he was unable to locate critical witnesses that could provide him with an alibi. The defendant also contends he has suffered continued anxiety associated with the public accusation of a crime. In the defendant's own Motion to Dismiss, pursuant to Tennessee Rule of Criminal Procedure 48(b), he stated that he was not only imprisoned for the crimes at issue, but was subject to criminal prosecution in another jurisdiction. Therefore, the defendant was already subjected to anxiety due to the knowledge that he could be prosecuted in another jurisdiction. Furthermore, the defendant was subject to public scrutiny due to the accusation of a crime in another jurisdiction. The record does not reflect that the delay impaired the defendant's ability to defend himself, as he did not offer proof as to witnesses who could have provided helpful testimony. The fourth factor does not weigh in the defendant's favor.

**(5)     Guilt**

There exists another element that should be considered in the judgment of whether the defendant was denied the right to a speedy trial. "[E]ven if not considered a factor bearing on the final judgment to be made, it is an element that can be used in judging the other factors." Bishop, 493 S.W.2d at 85. "This element is the strength of the State's case as to guilt." Id. To this element, we do not review in terms of sufficiency of evidence, but will review evidence that supports the verdict and the strength of the State's case. In the instant case, the State presented circumstantial evidence that speaks directly to the defendant's guilt. The State presented credible eyewitness testimony and evidence regarding the recovery of stolen items within a short distance of the area in which the defendant was arrested. Given that the evidence strongly indicates the defendant's guilt, we find this factor weighs heavily against the defendant.

**C.     Dismissal of Indictment - Due Process**

The Tennessee Supreme Court has stated that "[a] delay that does not implicate the speedy trial right may still raise due process concerns under the Fifth And Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Tennessee Constitution." Utley, 956 S.W.2d at 495. In order for the defendant to obtain relief, based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused. State v. Utley, 956 S.W.2d 489, 495 (Tenn. 1997) (quoting State v. Dykes, 803 S.W. 250, 255 (Tenn. Crim. App. 1990)). The defendant established that the eighteen-month delay between his indictment and trial is sufficient to trigger this Court's analysis of his right to a speedy trial. However, the defendant failed to produce evidence as to the prejudice he has suffered as a result of the delay. The State and the defendant have conceded that the delay was not caused to harass or to gain some tactical advantage, but was due to the negligence of the State in bringing the case to trial in a timely manner. Under these circumstances, it appears the delay was not so egregious that the defendant's rights to due process of law were violated.

The defendant contends that his right to a speedy trial was violated, and both he and the State acknowledge there exists no explanation for the delay in bringing the defendant's case to trial. However, the defendant did not suffer any prejudice from the delay, and the State's case strongly established the defendant's guilt. Balancing all of the above-mentioned factors, we conclude that the defendant has not been denied his constitutional right to a speedy trial.

## III.  Conclusion

Accordingly, we affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE