# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 7, 2004

## STATE OF TENNESSEE v. STEVEN A. MEYER

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40970     Michael R. Jones, Judge**

---

### No. M2003-02297-CCA-R3-CD - Filed June 25, 2004

---

At his first trial, the defendant, Steven A. Meyer, was convicted of first degree murder and the trial court, *sua sponte*, overturned the jury verdict, concluding that it was against the weight of the evidence. At the second trial, the jury again found the defendant guilty of first degree premeditated murder, and he was sentenced to life imprisonment. On appeal, he argues that the evidence was insufficient to sustain his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal); Steven A. Meyer, Pro Se, and Edward DeWerff, Clarksville, Tennessee (at trial), for the appellant, Steven A. Meyer.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Helen O. Young, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant was convicted of the first degree premeditated murder of his former girlfriend, Joanne Wilcox. The proof presented by the State shows that he confronted the victim in a parking lot on June 16, 1999, as they were in their respective vehicles, shot her multiple times, and then fled the scene. At his second trial, the defendant, assisted by elbow counsel, represented himself.

Jessica Gilbert, the victim's daughter, testified that she moved to Clarksville in January 1999, living with her sister, the victim, and the victim's boyfriend, the defendant. Her family moved out

of the apartment about two and a half months prior to the victim's death, the move precipitated by the defendant's having a new girlfriend, which upset the victim. She said that the defendant unexpectedly came to their apartment on June 16, 1999, and asked the victim "about maybe going to a movie and getting a motel room." The victim declined, saying she was going out with friends, but the defendant "just kept asking her, he wanted her to go out with him." The victim told the defendant to leave, but he sat down on the couch. The victim left in her car between 7:30 and 8:00 p.m.

Gilbert said the defendant had threatened the victim twice after their breakup. He first threatened her by saying "if he caught her with another man, he would kill her." The second threat, about one and a half months before she was killed, was made as the two were arguing about the defendant's new girlfriend and the victim's friend, Jessie. The defendant repeated his threat "[t]hat if he caught her with another man, that he would kill her." About four days before the victim's murder, the defendant gave the victim two guns, a nine-millimeter and "a .22," in a black case "for her protection." A day or two later, the couple argued and the defendant retrieved his guns. Gilbert said that the victim had never threatened the defendant or his girlfriend, Lisa Miller. On cross-examination, the witness said she never saw the defendant hit the victim, but she had seen "a lot of bruises" on the victim. She said she saw the victim's wrist after the defendant "broke it."

Crystal Ramos, the victim's other daughter, testified that she saw the defendant the night of the victim's murder, when he unexpectedly came to their apartment and asked the victim to go to a motel room and a movie with him. The victim declined and asked him to leave. Ramos said the defendant once told the victim "if he couldn't have her, then nobody could." On cross-examination, Ramos recalled the defendant's bragging about "cheating" on the victim and recalled an occasion when the victim found something in the defendant's wallet regarding Lisa Miller, at which time the defendant threatened the victim and pushed her off the porch.

Steven Taylor testified that on June 16, 1999, at about 8:40 p.m., he was driving down Crossland Avenue past a building owned by his employer when he noticed that a door was open. He stopped to close it and heard "profanity, hollering" from two voices down the hill near a business called Southern Secrets. He saw two vehicles, a white Plymouth car with a maroon top and a white GMC or Chevrolet pickup truck with an emblem in the back window, parked side-by-side, facing the same direction. A man was in the pickup truck and a woman was in the car. The man's "voice from the pickup was more dominant than the other one." He said that the vehicles left before he did, the white car leaving first and the truck following several seconds later. Taylor identified photographs of both vehicles.

Matthew Slight testified that he was a Clarksville police officer from 1995-2000 and, at the time of trial, was employed as a civilian police officer in Kosovo. Estimating that he had been one and a half to two blocks from the crime scene on June 16, 1999, Slight said he heard eight to ten gunshots. He described the shots as "a series of – there was – roughly four – pow, pow, pow, pow – a pause, and then pow, pow, pow, pow and then what I heard to be – tires squealing." While searching the area, he received a radio dispatch saying the shots came from Riverside Center. As

he neared the area, he observed a vehicle with the motor running parked against a telephone pole. As he approached the vehicle, he saw, between the driver and passenger seats, a woman "slumped in the seat and it appeared that she had undergone some severe trauma." He checked the victim and determined that she did not have a pulse. He said there were several gunshots to the driver's side door and a handwritten note on the backseat of the victim's vehicle.

Sergeant Scott Cutler of the Clarksville Police Department Crime Scene Unit testified that when he arrived at the scene, the locations of some of the shell casings had already been marked with milk crates. Officers collected the shell casings and found lead fragments on the armrest and on the passenger's side floorboard of the victim's vehicle. After the car was towed, additional lead fragments were found inside the driver's door.

Dr. John E. Gerber testified that he performed the autopsy on the victim and described her wounds as "a penetrating gunshot wound of the left mid-back," which "briefly lacerated the thoracic aorta;" a perforating wound to the left side of her face, which went out the right side of the face; a perforating wound to the upper left back; and a perforating wound along the left chest. The cause of death was multiple gunshot wounds, with the one to the left back causing the "the most serious injuries." As to the victim's wounds, he testified that "[t]here was no evidence of gun powder [sic] or stipling or black soot on the skin around the entrance wounds," indicating the shots had been fired from greater than two feet. Although he did not examine the victim's clothing for powder marks, he said the wounds to her face and upper back were distance wounds. Dr. Gerber did not classify any of the wounds as defensive.

Sergeant Timothy Saunders of the Clarksville Police Department testified that he attended the victim's autopsy and took custody of the bullet recovered by Dr. Gerber, placed it in an envelope, and turned it into the evidence room.

Officer Gary Hodges of the Clarksville Police Department testified he photographed the crime scene, assisted in the search for evidence, and collected the victim's clothes at the hospital. He also located the defendant's vehicle at the K-Mart on Highway 41-A at approximately 2:30 a.m. on June 17, 1999, and conducted surveillance on it until 8:00 a.m., at which time other officers arrived to search the vehicle.

Officer Tim Anderson testified that he was a thirteen-year veteran of the Clarksville Police Department, assigned to the Major Crimes Unit. He searched the defendant's truck at the K-Mart at 8:20 a.m. on June 17, 1999, the defendant having consented to the search. Behind the seat of the truck, Anderson found a black pistol case containing a nine-millimeter pistol and a magazine which was unloaded in the pistol. In the foam of the gun case was an impression of another handgun which was about "four to five inches high and maybe five inches long." He found several .22-caliber bullets in a Rolaids bottle in the glove box and two .22-caliber casings in the outside vent area on the driver's side where the windshield converged with the hood of the truck.

Lisa Miller testified that she and the defendant met while working in the laundry department of the Opryland Hotel in Nashville, and, in May 1999, they became romantically involved. The defendant told her that he and the victim were "still together but broken up." Miller was with the defendant the night before the victim's murder when the defendant took a black or gray plastic case from under the seat of his truck, set it on the hood, and took out two guns which he showed to Miller and her brother. Describing the guns, Miller said, "[T]he big one was black or gray and the small one had brown on it." The defendant put the guns back into the case and returned them to the same location in the truck. She and the defendant then took her brother and his girlfriend home, near the Golden Nugget, where they saw the victim's car. The defendant "wanted to go inside to see who [the victim] was with," but Miller told him "if he got out that [she] would leave him there." Miller said they saw the victim through the door of the club. The defendant then spent the night with Miller at her mother's house, and, the next morning, he and her mother left for work between 4:00 and 4:30 a.m. Miller later drove the defendant's truck to work for the second shift, arriving at around 1:00 p.m. The defendant then drove his truck back to Clarksville when he got off work between 4:00 and 4:30 p.m. The defendant telephoned Miller at about 9:40 p.m. to tell her that he would pick her up from work. He arrived at her workplace at about 11:00 p.m., and they drove to the K-Mart on Madison Street where the defendant lifted the hood of his truck and disconnected something. They then left the truck at the K-Mart, rode a shuttle bus to Fort Campbell, and then drove her mother's car home. The defendant spent the night with Miller and was still sleeping when she left the next morning to take her mother to work.

Anthony Fulmer, Lisa Miller's brother, testified that he met the defendant in June 1999 and saw him the day before the victim's murder at the home of Fulmer and Miller's mother. The defendant retrieved "a couple of guns" from his truck and showed them to Fulmer and Miller. Describing the guns, Fulmer said, "[T]he black one . . . it looked like a BB gun and the other gun, a little chrome gun that could fit in my hand." The defendant returned both guns to his truck.

Sergeant Robert Miller of the Clarksville Police Department testified that he investigated the victim's murder and that the note found in the victim's car had the defendant's name on it. Officers located the defendant during the early morning hours of June 17, 1999, at Lisa Miller's residence, and he voluntarily accompanied the officers to their office. Sergeant Miller obtained the defendant's consent to search his vehicle and residence. While other officers conducted the search, the witness stayed with the defendant who related his activities from the previous day. The defendant's initial statement was that, on June 16, he had gone to the victim's house to ask her about "doing something" with him that night. She declined and when she left, he followed her in his vehicle, flashing his lights and honking his horn to get her to stop. He stopped at a traffic light, while she went through, causing him to lose sight of her. He then went to his apartment, got a change of clothes, and started for Lisa Miller's house but ended up picking Miller up at work, with them staying at her home the rest of the night.

When Sergeant Miller showed the defendant the note found in the victim's car, the defendant admitted writing it; however, he claimed to have written it on Thursday or Friday of the preceding week. The note read: "JoAnne, someone told me that they caught you fucking someone in the

backseat of your car Tuesday night at the Gold Nugget. Just when you thought you knew someone. Yeah right. It was verified. Steven." The reverse side read: "Friday night – Gettin' a little more, huh? If you want to save us – come clean." The defendant acknowledged owning two pistols, a nine-millimeter, which was in his pickup, and a .22-caliber, which he claimed was in a dresser at the victim's house. Approximately three hours after the defendant came to the police station, he was told that the victim was dead. The defendant reacted by hugging the other officer in the room and saying, "[N]o, no, no," but, according to Miller, the defendant did not cry or ask how the victim died. Asked if he had shot the victim, the defendant said, "Fuck no" and denied any knowledge of her death.

The defendant subsequently admitted that he followed the victim from her house and that he ran the traffic light, although he initially said he had stopped at the light. He said he and the victim stopped their vehicles and talked. According to the defendant, the victim threatened to kill him as well as Lisa Miller, her child, and her unborn baby. The defendant said that the victim produced his loaded .22-caliber pistol and pointed it at him. He then grabbed the pistol and started firing. When the pistol was empty, he dropped it and heard it hit the victim's car. The defendant then drove home, picked up his clothes, drove around, and called Lisa Miller at work by pay telephone. He said the shooting occurred at approximately 8:35 p.m. Asked how many shots were fired, the defendant said, "I was leaned over out the window, I emptied the clip. The clip holds seven and one in the chamber." Sergeant Miller said that the defendant showed no signs of emotional distress while giving his statements.

Officer Raymond Macias of the Clarksville Police Department testified that he was present during the defendant's interview. After Macias told the defendant he would like to hear his "side of the story," the two walked outside. The defendant then told Macias that he and the victim had raced through the streets, with him chasing the victim, before stopping on Riverside Drive. The defendant said he and the victim had a heated argument, and the victim pulled a gun. The defendant grabbed the gun from her, turned it, fired every round into the victim, and then threw it down between the two vehicles. The defendant said "he knew that he hit [the victim] because he heard her go, Uh and then saw her slump into the center console." He said he left the area and later came back and saw the yellow tape surrounding the victim's vehicle. Macias and the defendant then went back inside, and the defendant told Sergeant Miller that he wanted to change his story. Macias said the defendant showed no signs of emotional distress.

Special Agent Donald Carman of the Tennessee Bureau of Investigation Forensic Firearms Identification Unit testified that he examined the lead bullet fragments from the armrest, passenger's side floorboard, and driver's side door of the victim's car. He could not conclusively match the bullets as having come from the same barrel, but did conclude that most of the fragments were .22-caliber bullets, although some were too mutilated for comparison. Two .22-caliber bullets, one from the victim's body bag and the other recovered from the victim's body, were both fired from the same gun and consistent with those bullets found in the Rolaids bottle in the defendant's truck. Agent Carman said that the shell casings found at the scene and those from the defendant's truck were all struck by the same firing pin of a .22-caliber weapon. He said he examined the six bullet holes on

the exterior of the driver's side door of the victim's vehicle, and they "were all consistent with .22 caliber holes."

Officer Joe Sustek, testifying as the first defense witness, stated that he was the fourth officer to arrive at the crime scene. He assisted in taping off the scene and obtained information for the original report about the shooting. He did not interview witnesses or take statements.

Officer William Nalley testified that he responded to a criminal trespass call on May 22, 1999, at 701A Cumberland Drive, where the defendant met him at the front door. He said that the Jessica Seton named in the report was in the defendant's care and that the two individuals whom the defendant wanted cited for criminal trespass were Seton's friends and had been invited by her to the residence.

Officer Vincent Lewis testified that he and Detective Matt Slight responded to the shooting scene on Riverside Drive. They found the victim's vehicle with the motor still running. Slight opened the driver's side door, and both saw the victim lying across the seat. Lewis backed out of the vehicle and radioed for a supervisor and an ambulance. He also testified that he saw a purse and a handwritten note in the backseat.

Richard Brady testified that the defendant had dated his daughter. He said that, although asked by the defendant to do so, he had not taken possession of any guns because he did not want his daughter or grandson exposed to danger and acknowledged that he may have seen the defendant with a small silver pistol.

Detective Nicholas Newman of the Clarksville Police Department testified that he responded to a shots-fired call on June 16, 1999. He said he saw the victim's car against a telephone pole on Riverside Drive and took photographs of it. He also saw a note on the backseat of the car.

Lee Potts testified that he had worked with the defendant. He said the defendant asked him about two weeks before the victim's murder to "hold" some guns for him, but the exchange never took place. He said the defendant told him that he "wanted to get [the guns] out of the house" because he "was afraid that either [the victim] or some of her friends may take them or do something with them or something might happen."

Debbie Adams testified that she was the defendant's manager at the Opryland Hotel. She acknowledged that the defendant had a relationship with a coworker, Lisa Miller. Adams received telephone calls from the victim who inquired about the defendant and his work duties. She recalled an occasion when the victim accompanied the defendant to work and asked who Lisa Miller was because the victim wanted to "whip her ass."

Mildred Beard testified that the defendant was one of her tenants until he went to jail. She said that he first moved into the apartment with the victim, and later the victim's two children moved in. The victim and her children subsequently moved into another apartment within the complex.

She acknowledged that she had let the victim in the defendant's apartment "a couple of times" after the victim had moved out.

Laura Brady testified that she knew the defendant through work and her daughter, Lisa Miller, whom the defendant dated until he went to jail. She said she had seen the defendant's two guns and a gray gun case by the defendant's truck, but she could not remember the date this occurred. She had never seen the defendant hit anyone or heard him talk badly about the victim.

Officer John Waderker testified that he responded to a criminal trespass call at 701 Cumberland Drive on May 22, 1999, and the victim was present. He said when he issued the victim a speeding citation on June 3, 1999, she gave her address as 701 Cumberland Drive.

Investigator Cheryl Anderson testified that she assisted Sergeant Miller with his investigation. At the scene, she saw a vehicle in the parking lot against a light pole and a handwritten note lying on the backseat.

Patricia Meyer, the defendant's sister, testified that she last saw the defendant in 1999 at the Montgomery County Jail. She said she had never seen the defendant threaten, hit, or call the victim names. John Meyer, the defendant's brother, testified that the defendant came to their grandfather's funeral in Iowa without the victim and said that he had a new girlfriend, Lisa Miller. He said the defendant had two guns, a nine-millimeter Baretta and a .22-caliber Taurus. He said he had never seen the defendant point a gun at or physically assault anyone, including the victim.

## ANALYSIS

### Sufficiency of the Evidence

As the sole issue, the defendant argues that the evidence was insufficient to support his conviction for first degree murder.

Before reviewing the issue raised by the defendant on appeal, we first will consider his claim that he cannot be retried because of the trial court's ordering a new trial following his first trial. In that ruling, the court concluded that the verdict was against the weight of the evidence and ordered a new trial:

> Pursuant to Rule 33(f), Tenn. R. Crim. P., the court, *sua sponte*, finds that the jury's verdict is against the weight of the evidence. Accordingly, the judgment is vacated and a new trial is granted.

Tennessee Rule of Criminal Procedure 33(f) provides that a trial court may grant a new trial if the verdict is against the weight of the evidence:

> New Trial Where Verdict Is Against the Weight of the
> Evidence. – The trial court may grant a new trial following a verdict
> of guilty if it disagrees with the jury about the weight of the evidence.
> If the trial court grants a new trial because the verdict is contrary to
> the weight of the evidence, upon request of either party the new trial
> shall be conducted by a different judge.

The Advisory Commission Comments to Rule 33(f) explain that double jeopardy does not prevent retrial of a defendant if, in a trial, the verdict is against the weight of the evidence:

> One should distinguish a new trial granted because the verdict
> is against the weight of the evidence from a granted motion for
> judgment of acquittal under T. R. Crim. P. (29)(c) for insufficiency
> of evidence to convict. In the latter situation, retrying the defendant
> would result in double jeopardy, while in the former situation it
> would not.

Accordingly, we respectfully disagree with the defendant's claim that the trial court's ruling at the conclusion of the first trial precluded his being tried again. In fact, Rule 33(f) allows a retrial when the court concludes a verdict is against the weight of the evidence, and that is what occurred in this case.

The defendant was convicted for the violation of Tennessee Code Annotated section 39-13-202, which defines first degree murder as "[a] premeditated and intentional killing of another." The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). There are several factors that tend to evidence premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular
> cruelty of the killing; declarations by the defendant of an intent to
> kill; evidence of procurement of a weapon; preparations before the
> killing for concealment of the crime, and calmness immediately after
> the killing.

Bland, 958 S.W.2d at 660.

Applying these factors, our supreme court, in State v. Keough, 18 S.W.3d 175 (Tenn. 2000), concluded that the evidence presented in that case had established premeditation:

> When viewed in a light most favorable to the prosecution, the evidence revealed: that the defendant was looking for the victim on the night in question; that the defendant was in possession of a rifle knife or bayonet; that the defendant found the victim at a bar drinking with another man; that an argument ensued between the defendant and the victim; that once outside the bar, the defendant stabbed the unarmed victim forcibly in the chest with the bayonet; that the defendant disposed of the murder weapon; and, that the defendant sought money to flee. This evidence, when viewed as a whole under the appropriate standards of appellate review, was legally sufficient to support a finding that the defendant acted with premeditation.

Id. at 181.

Taken in the light most favorable to the State, the jury in this matter could have reasonably concluded that although the defendant's romantic relationship with the victim had ended, he still was jealous of her being with others, twice telling her daughters that he would kill her if he caught her with another man and that if he could not have her, no one could; that the defendant left a handwritten note for the victim, accusing her of having sexual relations with others; that his curiosity in the victim's dating others continued to the point that, the night before the victim was killed, he stopped at the bar where the victim was, wanting to go inside to see who she was with even though his new girlfriend was with him at the time; that he followed or pursued the victim to the location where she was killed; that before the shooting, they argued, with the defendant loudly cursing; that the defendant shot the victim multiple times, emptying his pistol by shooting the victim or firing into her car; that the defendant fled the scene "squealing" his tires; that the victim had been shot from a distance greater than two feet; that two spent casings were located on the driver's side of the defendant's truck contrary to his claim that he and the victim fought over the pistol; and that, following the shooting, the defendant disposed of the .22-caliber pistol with which he had shot the victim, replacing it in his pistol case with a nine-millimeter pistol. From all of this, we conclude that the jury reasonably could have determined that the State had established the elements of first degree murder. Accordingly, the defendant's claims are without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE