IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2004

**STATE OF TENNESSEE v. ADAM BETTS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-023911     J.C. McLin, Judge**

---

**No. W2003-01910-CCA-R3-CD  - Filed July 20, 2004**

---

The Defendant, Adam Betts, was convicted by a jury of first degree premeditated murder.  In this direct appeal, he argues that: 1) the evidence is insufficient to support his conviction; 2) the trial court erred by admitting a photograph of the victim; and 3) the trial court erred by denying the Defendant's request for special jury instructions.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Brett Stein and Robert Chamoun, Memphis, Tennessee, for the appellant, Adams Betts.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Goodman and Mike Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On May 16, 2001, the victim, Debra Walker, was at her mother's house on Hastings Circle in Memphis.  At around 9:30 that evening, the victim, her mother, Marlyn Walker, and her sister, Lakesha Walker, were in the living room, talking.  The telephone rang, and Lakesha answered it.  There was a knock on the door, and the victim opened the door.  A man, later identified as the Defendant, shot the victim twice through the glass storm door, then ran off.  The victim died from the gunshot wound she sustained.

Lieutenant Tracy Grossett of the Memphis Police Department received a tip through Crime Stoppers that the Defendant was the shooter and that he had admitted shooting the victim.  On May 17, 2001, Lt. Grossett located the Defendant, who agreed to talk to the officers at the police station.  The Defendant waived his <u>Miranda</u> rights and gave a statement to the police.  In his statement, he

admitted that he knocked on the door at 668 Hastings Circle and shot the victim twice when she opened the door.

Dr. O'Brian Cleary Smith, the Shelby County Medical Examiner, testified that he performed the autopsy on the victim's body. She died from a gunshot wound to her chest. The bullet, which Dr. Smith determined to be from a .380 caliber pistol, passed through the victim's heart and esophagus.

Several witnesses, including the victim's mother, Marlyn Walker, as well as the Defendant and his mother, Sherry Betts, described an incident that had occurred in August of 2000. A young girl named Angel, who was a friend of the victim's family, got into a fight with the Defendant's cousin, named Erica Perkins.[1] As a result, several members of the Defendant's family, including Erica, got into a truck and went to Hastings Circle, where the victim's family lived. The girls, who were approximately ten or eleven years old, fought again, and Erica "won" the fight. According to Ms. Walker, Erica and her group then left. However, the Defendant and his mother testified that Angel then ran inside the house and retrieved a knife. The Defendant testified that Angel lunged at Erica with the knife, but his mother omitted this detail in her testimony. They both testified that a lady, who had been standing nearby, pulled a pistol out of her purse and fired it into the air at least twice. At that point, the Defendant's family left and returned to their home.

According to Ms. Betts, later that evening, she saw a black van go by her house. She recognized the driver as the lady who had fired the shots in the air earlier that evening. She also saw Angel in the back seat. The Defendant testified that it was only ten minutes after they arrived at their apartment when he saw what he described as a "black Blazer" go by their residence. He also saw the little girl named Angel in the vehicle. The Defendant approached the vehicle, and shots were fired out the passenger window. The Defendant estimated that between nine and twelve shots were fired. One of the bullets grazed the Defendant's face, and one of the bullets struck his mother in the chest.

Ms. Betts testified that, on a couple of occasions after the shooting, people that she could not identify went by her house in a green Nissan. They pointed and laughed at her. She also said that the little girl who had fought with her niece went by her apartment laughing. She testified that she "felt threatened" by this and called the police a couple of times. The Defendant testified that, beginning two days after Ms. Betts was shot, the black Blazer went by their residence several different times, and the passengers were "looking and pointing and giggling." According to the Defendant, this went on for ten months. The Defendant testified that it was not always the same car, but the driver was always the man that he had seen shoot his mother from the passenger seat of the black vehicle.

---

[1] The Defendant testified that Erica said that she had been "jumped." Ms. Betts testified that Erica said that six women had "jumped" her. In any event, the record is clear that Erica and Angel had been involved in an altercation with one another.

On May 15, 2001, approximately nine months after the events in August of 2000, and one day before the Defendant killed the victim, Ms. Betts was sitting outside her apartment. She testified that a black van pulled up to her driveway and stopped. She recognized the little girl named Angel in the van. A man got out of the van, and the Defendant, who was also outside, said, "[M]ama, that's the man right there that shot you." Ms. Betts testified that the van left, and the Defendant called the police, but they did not respond to the call.

Ms. Betts testified that the next morning, a man drove up to her driveway in a gold car. He got out, pulled a gun on her, and threatened her. She testified that she did not recognize this man, as she had not seen him before. She went upstairs and told the Defendant, who had just gotten home from work, what had just happened. The Defendant said, "I'm tired of these people fucking with my mama." However, Ms. Betts testified that the Defendant was calm, not agitated or upset.

The Defendant also testified about the events of May 16, 2001. He recalled that his mother woke him up at approximately 9:30 a.m., saying that a man who was looking for someone named "Darrell" had just pulled a gun on her. The Defendant called and left a message for Prentiss Jolly with the Memphis Police Department, then he went and got a state identification card.[2] He called several of his friends, including Cory Robeson, who was at a nearby pool hall. He met Mr. Robeson at the pool hall at approximately 4:40 in the afternoon. There they each drank a quart of beer; then they smoked a "blunt," which is a cigar filled with marijuana. At 6:00 p.m. they left the pool hall and went to the store to buy more beer and liquor. They went back to the Defendant's house and drank alcohol, smoked marijuana, and played dominoes. The Defendant testified that he then "told Cory [he] needed to do something about this tonight." Mr. Robeson agreed to let the Defendant borrow his gun. This occurred at approximately 8:10 p.m. The Defendant said to Mr. Robeson, "Let's go on and go do this," but Mr. Robeson said, "it's too early right now." They watched a video until about 9:40 p.m. At that time, Mr. Robeson went outside, got his gun, and "oiled it down" for the Defendant. They then went to the store to buy more beer, which they drank. The Defendant testified that it was approximately "10:05 to 10:13" that evening. At this point in the trial, the Defendant's attorney asked him, "did the enormity about what you were about to do even enter your mind?" The Defendant answered, "Yes, sir." However, the Defendant said that he "was just at the last breaking point." He called the police several times, but he got "no type of cooperation from the police."

Mr. Robeson drove the Defendant to Hastings Circle, where he put a ski mask over his face and a black hood over his head. He knocked on the door where the victim's mother lived, and the victim answered the door. The Defendant testified, "I looked at her, and I put my head down. And I just put the gun to the glass, and I fired two shots." He said, " I really wasn't planning to kill her. I just was trying to send a message to these people, you know, leave me and my family alone." The Defendant testified that he was scared, and he did not want anything else to happen to his family.

---

[2]According to the Defendant's statement to the police, he also did some laundry before he left to get his state I.D. card.

After he shot the victim, he ran through a park and back to his house. As he ran, he threw the gun away.

On cross examination, the Defendant stated that he did not know the identity of the man who threatened his mother on the morning of May 16; neither did he know where the man lived or to whom he was related. The State's attorney asked him whether he talked to Cory Robeson "about what's going to happen tonight," and the Defendant replied that he had. Then the prosecutor asked, "So you were planning this, weren't you?" The Defendant responded, "Yes, sir." The Defendant admitted that he put a stocking on his face to conceal his identity. Then the prosecutor and the Defendant had the following exchange with respect to what happened as he approached the victim's mother's house:

> Prosecutor: You ran around there to the house. And you walked into the yard. But you stopped and started to turn around; is that right?
> Defendant: Yes, sir.
> Prosecutor: But something inside you told you to go on and do it?
> Defendant: Yes, sir.
> Prosecutor: Go and do what?
> Defendant: Go on, go ahead and do this.
> Prosecutor: Okay. So when you got to the yard, you had second thoughts?
> Defendant: Yes, sir.
> Prosecutor: But you thought about it again and decided to go ahead and commit the shooting?
> Defendant: Yes, sir.

Finally, the State's attorney asked the Defendant, "So you spent all day long on Wednesday, May 16th, you spent all day planning and working up the courage to go to that house on Hastings and shoot somebody, didn't you?" The Defendant answered, "Yes, sir."

The Defendant's cousin, Katisha Ivy, testified that the Defendant was very upset about his mother being shot in August of 2000. She stated that he often talked about wanting to find out who had shot her.

The State called Lieutenant Prentiss Jolly of the Memphis Police Department as a rebuttal witness. He testified that he investigated the shooting of Ms. Betts in August of 2000. He stated that the Betts family did not give him an identification of any of the passengers of the vehicle from which the shots came. He also testified that he did not receive any complaints from the Defendant about people driving by his house, laughing and pointing.

Based on this evidence, the jury convicted the Defendant of first degree premeditated murder, and he argues that the evidence is insufficient to support his conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact

of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

First degree murder is defined in pertinent part as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Id. § 39-13-202(d). Our statute further provides:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. A person kills another intentionally when it is the person's conscious objective or desire to engage in conduct that results in the victim's death. See id § 39-11-302(a).

In arguing that the evidence is not sufficient to sustain his conviction, the Defendant does not contend that he did not kill the victim. Rather, he maintains that the killing was not done with premeditation. He asserts that he should have been convicted of voluntary manslaughter, which our criminal code defines as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a). The Defendant argues that the events that occurred in August of 2000 and the ongoing harassment of people driving by his house, making threats, laughing, and pointing produced

in him a state of passion that was sufficient to lead a reasonable person to act in an irrational manner and which consequently rendered him incapable of premeditation.

A defendant's state of mind at the time he or she commits a homicide may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). "Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing." State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Circumstances that may warrant the trier of fact to infer premeditation include the defendant's procurement of a deadly weapon and the use of that deadly weapon on an unarmed victim. See id. at 615. The defendant taking preparations to conceal the crime before its commission is another circumstance from which the jury may infer premeditation. See State v. Keough, 18 S.W.3d 175, 181 (Tenn. 2000). The lack of provocation on the part of the victim and the defendant's failure to render aid to the victim are additional circumstances probative of premeditation. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Destruction or secretion of evidence of the murder may also be indicative of premeditation. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

The evidence in this case certainly supports the jury's finding that the Defendant killed the victim with premeditation. The Defendant procured a pistol from Cory Robeson, who oiled the pistol for him. With that pistol, the Defendant shot the victim, who was unarmed. Prior to shooting the victim, the Defendant covered his face with a stocking and his head with a hood in order to conceal his identity. The victim in no way provoked the Defendant, and not only did he fail to render aid to her, he fled. As he did so, he attempted to conceal his crime by throwing the gun down. Each of these factors is relevant to premeditation. Furthermore, the Defendant's own testimony evidences premeditation. He testified that he and Cory Robeson planned the shooting. He also testified that he had second thoughts about the shooting while he was in the victim's yard, and he even physically turned around. However, he ultimately decided to proceed with his plan. Finally, the Defendant admitted that he spent the day of May 16 "planning and working up the courage" to shoot somebody. Therefore, the evidence is sufficient to support the jury's finding of premeditation and the Defendant's conviction for first degree murder.[3] This issue is without merit.

Next, the Defendant asserts that the trial court erred by admitting a photograph of the victim, which was taken while she was alive. He argues that the photograph was irrelevant and unfairly prejudicial because it elicited an emotional response from the victim's father.

It is well-settled that the admissibility of photographs is a matter entrusted to the discretion of the trial court and a trial judge's decision to admit a photograph into evidence will not be overturned on appeal absent a clear showing of an abuse of that discretion. See State v. Carter, 114

---

[3]Further evidence against the Defendant's claim that he was in a state of "passion" when he shot the victim are: Ms. Betts' testimony that the Defendant was calm when she informed him of how she had been threatened on the morning of May 16; the fact that the Defendant waited approximately twelve hours from the time that he learned of the threat to the time that he shot the victim; and his failure to show any connection between the man who had threatened his mother and the people who lived in the apartment on Hastings Circle.

S.W.3d 895, 902 (Tenn. 2003); State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

The challenged photograph, which depicted the victim while she was still alive, was introduced through the testimony of her father, Joseph Walker, who became emotional when the photograph was presented to him. The photograph was relevant because the State had to prove that the life of a human being had been taken, and that the person killed was the same person named in the indictment. See State v. Nesbit, 978 S.W.2d 872, 901-02 (Tenn. 1998). The trial court did not abuse its discretion by finding that the danger of unfair prejudice resulting from the admission of the photograph and from the father's emotional response to the photograph did not substantially outweigh the probative value of the photograph. See Tenn. R. Evid. 403. Therefore, this issue is without merit.

Finally, the Defendant maintains that the trial court erred by denying his special request for jury instructions. Specifically, the Defendant requested the trial court give the following instruction:

> Ladies and Gentlemen of the jury, I further instruct you that the Defendant's theory in this case is that he could not be guilty of Murder in the First Degree or Murder in the Second Degree because he did not possess the pre-requisite intent to be guilty of either Murder in the First or Second Degree.
>
> In this connection, I further instruct you that if the Defendant's state of mind under all the facts and circumstances was so clouded with passion, which can be defined as "any of the emotions of the mind known as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection,["] you may consider these facts in reducing the charge of Murder in the First Degree to the lesser included charge of Voluntary Manslaughter. [State v. Phipps, 883 S.W.2d 138, 147 (Tenn. Crim. App. 1994)].

The Defendant argues that, by denying his special request, the trial judge did not properly "outline [his] theory of the case."

The record reflects that the trial court did instruct the jury as follows: "'PASSION' means any of the emotions of the mind known as rage, anger, hatred, furious resentment, or terror, rendering the mind incapable of cool reflection." Furthermore, the court gave the following instruction on the lesser-included offense of voluntary manslaughter:

> Any person who commits voluntary manslaughter is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following elements:
> (1) that the defendant unlawfully killed the alleged victim; and
> (2) that the defendant acted intentionally or knowingly; and

(3) that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The trial court also defined the mental states of "knowingly" and "intentionally." Finally, the court instructed the jury on the State's burden of proving every element of the crime charged beyond a reasonable doubt, each juror's duty to find the Defendant not guilty if he or she determined that the State had not met its burden, and the presumption of innocence to which the Defendant was entitled.

"Where the trial court's instructions on a matter are proper, its denial of a special request is not error." State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998); see also State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997). We conclude that the trial court's jury instructions were sufficient to counter the Defendant's request for special instructions that, if he were acting under "passion," he could not be convicted of first degree murder. This issue is without merit.

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE